**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| SAM EGGIMAN, individually and on behalf of all others similarly situated, | **Case No.:** |
| Plaintiff, | **CLASS ACTION** |
| | **COMPLAINT** |
| vs. | **JURY TRIAL DEMANDED** |
| BANK OF AMERICA, N.A., | |
| Defendant. | |

Plaintiff Sam Eggiman ("Plaintiff"), individually and on behalf of all others similarly situated as Massachusetts residents ("Class Members"), brings this action against Bank of America, N.A. ("Bank of America," "BOA", "Bank" or "Defendant") for violations of the Electronic Funds Transfer Act, 15 U.S.C. §§1693 et seq., ("EFTA") and its implementing regulations at 12 C.F.R. Part 1005 ("Regulation E"), violations of the Massachusetts Consumer Protection Act, G.L. c. 93A, § 2, et seq., ("CPA"), breach of contract, negligence, and other state common law and statutory claims, to remedy Bank of America's egregious maladministration of its obligations under the Massachusetts Department of Unemployment Assistance ("DUA") benefits payment programs.

In violation of its constitutional, statutory, common law, and contractual obligations to Plaintiff and Class Members, the Bank has failed to take reasonable steps to protect Plaintiff and Class Members' benefits from fraud, has deprived them of their statutory right to public benefits without providing them with notice or an opportunity to be heard, and has otherwise failed to ensure that they are able to receive and access the public benefits to which they are lawfully entitled.

## I.    INTRODUCTION

1.    Like millions of other Americans, Plaintiff and Class Members lost their jobs through no fault of their own during the COVID-19 pandemic. Plaintiff and Class Members applied for unemployment and other public benefits through programs administered by Massachusetts Department of Unemployment Assistance ("DUA"). They were found eligible by DUA to receive, and were granted, the benefits to which they were and are lawfully entitled. Throughout the COVID19 pandemic, Plaintiff and Class Members have relied on these subsistence benefits to pay for food, housing, and other necessities of life.

2.    Pursuant to an exclusive contract between DUA and Bank of America, Plaintiff and Class Members received their periodic benefits payments not from DUA directly, but through Bank-issued and Bank-administered debit cards ("BOA-DUA Debit Cards" or "Cards"), which are linked to individual Bank depository accounts ("BOA-DUA Debit Card Accounts" or "Accounts"). Although the Bank was entrusted with administering these critical DUA Benefits, on which millions of vulnerable Americans' lives depend, and although the Bank was legally required to take necessary and reasonable steps to protect Plaintiff's and Class Members' BOA-DUA Debit Cards and Accounts from fraudulent access by third parties, the Bank failed to do so and indeed treated these Cards and Accounts with less care than it affords its regular consumer debit and credit cardholders.

3.    Among other things, the Bank failed to secure Plaintiff's and Class Members' sensitive Card and Account information and issued him and the Class BOA-DUA Debit Card's *without* the industry-standard, fraud-preventing EMV chip technology that the Bank has used on *all its regular consumer customers*' debit and credit cards since 2014.  Instead, for its *government benefits* customers, the Bank chose to issue debit cards with only outdated magnetic stripe

technology, which makes those cards far more susceptible to skimming, cloning, and other schemes that have allowed third parties to fraudulently use and access Plaintiff's and Class Members' BOA-DUA Debit Cards and Accounts.

4.    The Bank further breached its duties through its systemic practice of failing to take reasonable steps to secure Plaintiff's and Class Members' personal and financial information, including failing to ensure that this information was appropriately handled and not misappropriated by the Bank's subcontractors and their employees and agents, including by customer service representatives and other call center agents. The Bank's systemically lax security practices enabled unauthorized persons to access Plaintiff's and Class Members' personal and financial information and to make fraudulent, unauthorized transactions involving Plaintiff's and Class Members' BOA-DUA Debit Cards and Accounts.

5.    In addition to the Bank acting negligently and in breach of its statutory and common law obligations to Plaintiff and Class Members by failing to protect their BOA-DUA Debit Cards and Accounts, the Bank also has violated its statutory and common law obligations to Plaintiff and Class Members by failing to implement adequate and reasonable systems, measures, and protections to permit: prompt and effective identification of fraud on Plaintiff's and Class Members' Cards and Accounts, prompt submission of fraud claims (also referred to herein as unauthorized transaction claims), provisional access to already-approved benefits during the course of the Bank's investigations of fraud claims, prompt and accurate resolution of those claims, and prompt reimbursement of funds stolen from Plaintiff's and Class Members' Accounts.

6.    For example, instead of providing an effective and timely process for Plaintiff and Class Members to report fraud claims, the Bank adopted a series of "customer service" practices and policies that have required Plaintiff and Class Members to spend dozens of hours on the phone

with customer service, and that have otherwise frustrated and obstructed Plaintiff's and Class Members' efforts to submit such claims. When those Plaintiff and Class Members who persevered were finally able to reach the Bank's customer service representatives to report that unauthorized transactions had fraudulently been conducted on their BOA-DUA Debit Card Accounts, the Bank then violated their statutory, common law, and constitutional due process rights by denying their fraud claims without investigation or explanation and freezing their Accounts indefinitely, thereby depriving them of access to their past and future disbursements of DUA benefits without any prior notice or an opportunity to be heard.

7.     The cardholder agreement between Bank of America and each Plaintiff and Class Member ("Cardholder Agreement") sets forth the Bank's "Zero Liability" policy, which promises to protect each Plaintiff and Class Member from adverse financial consequences if their BOA-DUA Debit Cards or Accounts are fraudulently used or accessed by third parties. The Bank has not implemented this policy as promised, which has caused Plaintiff and Class Members to suffer significant financial losses from third-party fraud, including by the Bank failing to have reasonable procedures in place to identify and receive notifications of fraud, failing to adequately monitor its customer service, establishing procedures that frustrate and obstruct timely submission of fraud claims by Plaintiff and Class Members, closing fraud claim investigations without having conducted a reasonable investigation, and failing to extend provisional credit to Plaintiff and Class Members as required by law while fraud claim investigations are underway.

8.     The Bank has also deprived Plaintiff and Class Members of their constitutional rights to notice and an opportunity to be heard before causing their BOA-DUA Debit Cards and Accounts to be frozen or blocked for extended periods of time, thereby depriving Plaintiff and

Class Members of access to past, present, and future disbursements of unemployment and other government benefits for which they have been found eligible.

9.      By the acts and omissions alleged here, Bank of America has violated federal and state constitutional due process protections; violated EFTA and its implementing Regulation E; acted negligently; and breached its Cardholder Agreement with Plaintiff and Class Members, its contract with DUA (to which Plaintiff and Class Members are intended third-party beneficiaries), the implied covenant of good faith and fair dealing under those contracts, and its fiduciary duties to Plaintiff and Class Members. These acts and omissions have caused substantial financial and other harm to Plaintiff and Class Members, and unless promptly enjoined will cause them and the public to suffer immediate and irreparable harm.

## II.     PARTIES

10.     Plaintiff Sam Eggiman is, and at all relevant times was, an individual and a citizen and resident of Groton, Massachusetts. Plaintiff qualified for, and received, DUA benefits in the State of Massachusetts, and those benefits were delivered to Plaintiff through Bank of America. Plaintiff received his DUA benefits through a Bank of America account and was issued a Bank of America DUA Debit Card.

11.     Defendant Bank of America, N.A., is, and at all relevant times was, a financial institution incorporated in the State of Delaware and headquartered in North Carolina that conducts a substantial amount of business in Massachusetts, including pursuant to its exclusive contract with the State of Massachusetts DUA to administer unemployment benefits and other benefit payments through BOA-DUA Debit Cards and Accounts.

### III.    JURISDICTION AND VENUE

12.    This Court has subject matter jurisdiction pursuant to: (a) 28 U.S.C. §1331 because this action arises under the federal Due Process Clause and the Electronic Fund Transfers Act, 15 U.S.C. §§1693 et seq.; (b) 28 U.S.C. §1332(d) because this is a class action in which the amount in controversy exceeds $5,000,000, there are more than 100 putative Class Members, and the majority of putative Class Members are citizens of a state different than the state of which Bank of America is a citizen; (c) 28 U.S.C. §1332(a) because Plaintiff and Class Members are citizens of Massachusetts, Bank of America is incorporated under the laws of Delaware and has its principal place of business in North Carolina, and the amount in controversy exceeds $75,000; and (d) supplemental jurisdiction under 28 U.S.C. §1367 with respect to the claims for relief arising under state law.

13.    This Court has specific personal jurisdiction over Bank of America because the Bank has sufficient minimum contacts with Massachusetts, has purposely availed itself of the benefits and protection of Massachusetts law, and conducts a substantial amount of business in and with the State of Massachusetts (including with DUA), such that the Court's exercise of personal jurisdiction over the Bank is reasonable and does not offend traditional notions of fair play or substantial justice.

14.    Venue is proper in this District pursuant to 28 U.S.C. §1391, because Plaintiff resides in this District, a substantial portion of the acts or omissions giving rise to the claims alleged occurred in this District, and because Bank of America is subject to the Court's personal jurisdiction with respect to this action.

## IV.    FACTUAL ALLEGATIONS

### A.    Bank of America's Contract with DUA

15.    DUA is an agency of the State of Massachusetts that is responsible for administering numerous benefits programs for low-income, unemployed, and other Massachusetts residents, including programs providing Massachusetts residents with DUA benefits, such as unemployment insurance ("UI") benefits, pandemic unemployment assistance ("PUA") benefits, disability insurance benefits, and paid family leave benefits.

16.    On information and belief, prior to 2020 Bank of America entered into a contract with DUA to provide certain services, including issuance of BOA-DUA Debit Cards through which individuals entitled to receive DUA benefits could access those benefits.

17.    On information and belief, Bank of America obtained that contract in part by falsely representing to DUA that it would provide "best-in-class" fraud monitoring.

18.    On information and belief, continuing in to 2020 and beyond, DUA began distributing DUA benefits pursuant to its contract with Bank of America, under which the default means of distributing DUA benefits payments has been through Bank-issued and Bank-administered BOA-DUA Debit Cards, rather than paper checks or other forms of payment.

19.    On information and belief, the agreement Bank of America had with the Massachusetts Department of Unemployment Assistance included the representations that it would fully protect BOA-DUA Debit Cardholders in case they became victims of fraud.

20.    Specifically, the Bank represented that it would comply with all EFTA and Regulation E requirements and timelines with respect to error resolution and it provided assurance that its BOA-DUA Debit Cardholders should feel comfortable in dealing with disputed transactions knowing that it would extend its Zero Liability protection on disputed claims,

including ATM and pinned POS [point-of-sale] transactions. The Bank described its error resolution process as follows: "A Claimant can file a dispute by calling the Customer Service Center for complete instructions. . .. After selecting the 'dispute a transaction' option within our IVR [Interactive Voice Response], the cardholder will immediately speak with a live representative who will further review the transaction and any other possible fraudulent transactions with the cardholder. . .. Once a dispute is requested in our system, a case will be created within our claims tracking system and tracked until final resolution. Per Regulation E, within 10 business days of the initial dispute, we will promptly correct the error. . .. If more time is needed, we will temporarily credit the cardholder's account within 10 business days of the initiated dispute for the full disputed amount. There is no limitation or maximum to the credit amount provided. This will allow the account holder to use the funds while the claim is being resolved."

21.     On information and belief, DUA entered into a contract with Bank of America because of and in reliance on Bank of America's representations above.

22.     BOA-DUA Debit Cards and Accounts are an integral part of DUA's benefits distribution and administration system. Under the terms of the DUA-Bank Contract, those Accounts can only receive deposits from the DUA and do not allow commingling of benefits payments with other funds. The DUA-Bank Contract provides that the Bank will disburse to each claimant the entire amount the DUA authorizes and will process all benefit payment amounts provided by the DUA without alteration or adjustment.

**B.     BOA's Failure to Secure BOA-DUA Debit Cardholder Information**

23.     Bank of America has failed to store, share, transmit, or otherwise use BOA-DUA Debit Cardholders' personally identifiable information, Card and Account information, and other

financial data and information, including any such data or information learned in the course of providing customer service to Cardholders (collectively, "Cardholder Information") in a reasonably secure manner and consistent with the Bank's obligations to DUA and to Plaintiff and Class Members.

24.      The Bank has also failed to act reasonably in its hiring, supervision, training, and retention of its agents, including its subcontractors and its subcontractors' employees and agents, who have access to Cardholder Information, including as a result of staffing the Bank's Call Centers, interacting with Cardholders, and reviewing Cardholders' unauthorized transaction claims. The Bank has failed to take reasonable steps to ensure that its subcontractors and their employees and agents, including CSRs and other Call Center agents, maintain the security and confidentiality of Cardholder Information, including by failing to ensure: that all such agents were subject to reasonable background checks, that all such agents received reasonable training on maintaining the security and confidentiality of Cardholder Information, and that the Bank's subcontractors took reasonable steps to secure Cardholder Information from unnecessary or unauthorized access, disclosure, and exfiltration, including by the subcontractors' agents and employees.

25.      As a result of the Bank's acts and omissions alleged herein, Cardholder Information has been obtained by unauthorized third parties in a series of security breaches that have allowed Plaintiff's and Class Members' benefits to be stolen out of their Accounts through unauthorized transactions. The Bank's repeated and ongoing failure to secure Plaintiff's and Class Members' Cardholder Information violated and continues to violate the Gramm-Leach-Bliley Act and rules and regulations promulgated thereunder requiring the Bank to ensure the security of their customers' personal and financial information, and the Bank's common law duty to take

reasonable steps to protect Cardholder Information from unauthorized access, disclosure, and exfiltration, including by the Bank's own agents.

26.    Some BOA-DUA Debit Cardholders who have had money stolen from their Debit Card Accounts through unauthorized transactions, like Plaintiff, received but had not activated their BOA-DUA Debit Cards, and thereby never used their Cards.  Such unauthorized transactions could only have occurred if the Bank failed to store, share, transmit, or otherwise use Cardholder Information in a reasonably secure manner.

**C.    BOA's Use of Outdated and Vulnerable Magnetic Stripe Technology**

27.    When a debit or credit cardholder seeks to access funds on the card, for example at a point-of-sale terminal or ATM, the Cardholder Information stored on the card is first sent through a processing network operated by Mastercard. The first step in that process occurs at the point of sale, where the card must either be swiped or inserted into a card reader. The reader obtains the Cardholder Information stored on the card and transmits it to the financial services provider through a computer network, either at the time of the transaction or later in a "batch" with other transactions.

28.    From the 1960s until approximately 10 years ago, magnetic stripes were the standard for storing consumer information on debit cards and credit cards in the United States. A magnetic stripe contains static data about the card, including the cardholder's name, the card number, and the card expiration date. This data is printed directly on the outside of the card and recorded on the magnetic stripe. When swiped through a reader, this data is collected and transmitted as part of the transaction process.

29.    Because the data on a magnetic stripe are static and easily readable, magnetic stripe cards are highly susceptible to fraud. One of several common methods of stealing information

from magnetic stripe cards is called "skimming," a process by which a wireless transmitter affixed to a card reader collects the information on the magnetic stripe when the card is swiped or inserted and sends it to a nearby computer. The recipient can then use the information to clone the consumer's card, conduct unauthorized transactions, and access the bank account connected to the card.

30.     Personal data on magnetic stripe cards can also be captured by hackers on a large scale. For example, in 2013, hackers infiltrated the retailer Target's payment terminals and systematically captured the information of every swiped card for weeks, ultimately gathering the card information of tens of millions of people.[1] Card data collected in this manner can be sold on an underground market, where the stolen data can be used to make fraudulent purchases.

31.     Over the past decade, in an effort to stem the consumer fraud enabled by magnetic stripes, the financial services industry in the United States has adopted EMV chip technology as the industry standard. While magnetic stripes are "static," with the same card-identifying information provided for every transaction, EMV chips are "dynamic," meaning the data they contain can be interacted with, altered, and updated. An EMV chip creates a unique electronic signature for each transaction, making data from past EMV chip card purchases useless to would-be thieves, thereby significantly reducing the risk of unauthorized transactions.

32.     On September 30, 2014, Bank of America announced that it would include EMV chip technology on "all new and reissued" consumer debit cards. In announcing this shift, a Bank of America executive stated that "chip technology is an important tool in increasing card security, and we want our customers to have the best possible experience when using their payment cards."

---

[1] Elise Hu, "Target Hack a Tipping Point in Moving Away from Magnetic Stripes," NPR (Jan. 23, 2014), available at https://www.npr.org/sections/alltechconsidered/2014/01/23/264910138/target-hack-a-tipping-point-in-movingaway-from-magnetic-stripes.

The executive added that the "new chip-enabled cards will improve security of customers' transactions."[2]

33.     In 2015, card issuers and processors began a nationwide shift to EMV chip cards. By 2017, an estimated 855 million EMV chip cards had been issued to U.S. consumers, and such cards are now standard in the industry.

34.      As well, in 2015, card-issuing banks and payment networks introduced a new policy that shifted liability for fraudulent transactions away from themselves and onto retailers and card issuers. As of October 1, 2015, retail merchants who did not have certified EMV chip readers became liable for fraudulent transactions if the consumer presented an EMV chip card. In essence, this meant that liability for consumer card fraud would fall on either the retailer or the card issuer, whichever was the least compliant with the EMV protocol.

35.     A Bank of America acknowledges on its website that EMV chip technology "has been around for over 20 years and is the credit and debit card security standard in many countries around the world. When purchases are made using the chip feature at chip-enabled terminals, the transaction is more secure because of the process used to determine if the card is authentic. This makes the card more difficult to counterfeit or copy." The Bank also assures Cardholders on its website that "whether you use the magnetic stripe or the chip to make your purchase, you can have confidence in the protection and security features we provide for all credit and debit accounts."

36.     Bank of America has been aware for many years that EMV chip cards are significantly more secure than magnetic stripe cards and that EMV chip cards are the "debit card security standard." Despite that knowledge and despite the Bank's representations to DUA that it

---

[2] Bank of America Press Release, "Bank of America Begins Rollout of Chip Debit Cards" (Sept. 30, 2014), BusinessWire, available at https://www.businesswire.com/news/home/20140930005292/en/Bank-of-America-Begins-Rollout-of-Chip-Debit-Cards.

will focus on claimants while leveraging rapidly evolving payment technology and staying at the forefront of payments innovation, the Bank chose to issue BOA-DUA Debit Cards using old, vulnerable magnetic stripe technology to hundreds of thousands of the most financially vulnerable Massachusetts residents —Plaintiff and Class Members. To this day, the Bank continues to issue BOA-DUA Debit Cards with no EMV chip, notwithstanding its announcement nearly seven years ago that it would include EMV chip technology on all consumer debit cards to help prevent fraud. Predictably, the issuance of BOA-DUA Debit Cards without EMV chips has led to rampant fraud, resulting in the ongoing loss of millions of dollars in DUA benefits intended to assist Massachusetts residents who lost their jobs, including during the COVID-19 pandemic.

**D.     BOA's Contractual Promises and Representations to Cardholders**

37.     Bank of America represented to Plaintiff and Class Members, in its Cardholder Agreement and on its website, that they would not be responsible for unauthorized transactions on their BOA-DUA Debit Cards or Accounts because of the Bank's "Zero Liability" policy, under which the Bank would fully protect them against, and would reimburse them for, any unauthorized transactions.

38.     The Bank also represented to Plaintiff and Class Members that they could call the Bank 24 hours a day 7 days a week to report any unauthorized transaction to live customer services representatives, and that the Bank would promptly investigate the transaction and determine whether it was unauthorized within 10 business days thereafter, except that if the Bank took longer than 10 business days (but in no event longer than 45 calendar days) to investigate the transaction, the Bank would credit the Account within 10 business days for the amount claimed to be in error, so that Accountholders would have the money during the time it takes BOA to complete their investigation.

39.     On information and belief, the Bank's agreement with DUA which governs the handling of the debit cards, to which all BOA-DUA Debit Cardholders must agree, Bank of America sets forth the above promises in detail. These cardholder agreements were effective at the time Plaintiff received his benefits and thus has been effective throughout all claims made by Plaintiff. The agreement with BOA provided for *zero liability* for the cardholder in the case of fraud.

### E.     The Rampant Third-Party Fraud on BOA-DUA Debit Card Accounts

40.     In the spring of 2020, the COVID-19 pandemic devastated Massachusetts's economy, and thousands of workers lost their jobs due to business closures and mass layoffs. The state's unemployment rate skyrocketed to heights not seen in 44 years following closure orders.[3] Industries such as hospitality, food service, retail trade, and educational services were especially hard hit.

41.     As a result, thousands of Massachusetts residents turned to the DUA unemployment benefits programs administered by Bank of America to pay their bills and make ends meet. Since the start of the COVID-19 pandemic in March 2020, DUA has over 1 million claims for various unemployment benefits.[4] Bank of America has issued thousands of BOA-DUA Debit Cards to individuals found by DUA to be eligible for unemployment and pandemic-related benefits.

42.     Tens of thousands of BOA-DUA Debit Cardholders have been the victims of fraud throughout the pandemic, resulting in millions of dollars having been stolen from their Accounts, including through fraudulent ATM withdrawals, such as Plaintiff and Class Members have experienced.

---

[3] Greater Boston Chamber of Commerce, *COVID-19 Unemployment in Massachusetts*,
https://www.bostonchamber.com/public-policy/issues-impact/covid-19-unemployment-in-massachusetts
[4] *Id.*

43.    BOA-DUA Debit Cardholders have reported thousands of dollars stolen through unauthorized use of their DUA Debit Cards. These unauthorized transactions have taken various forms, including massive ATM withdrawals in distant states and countries, thousand-dollar charges at luxury vendors, and repeated transactions with food delivery services. Regardless of how or where the fraud has been carried out, the Bank's BOA-DUA Debit Cards have proven highly susceptible to unauthorized use.

44.    After criminals exploit the security vulnerabilities of the Bank's BOA-DUA Debit Cards and Accounts and misappropriate Cardholder Information, that information can be sold on the dark web, allowing the buyers to engage in unauthorized use of funds belonging to Plaintiff and Class Members.

45.    Such rampant third-party fraud was readily foreseeable given the rapid growth of the number of new unemployment benefits claims, as well as reports from early in the pandemic warning of the potential for fraud and exploitation of the unemployment benefits system by criminals. It is well known in the financial industry that crises such as economic recessions lead to an increase in scams, fraud, and other financial crimes. The early months of the COVID-19 pandemic in the United States—March through May 2020—made clear that the pandemic would be no exception. In late March 2020, the federal Coronavirus Aid, Relief, and Economic Security (CARES) Act was signed into law, injecting $2.2 trillion of relief into the American economy, including $260 billion in increased unemployment benefits, and hundreds of billions of dollars more in one-time cash payments to taxpayers and forgivable Paycheck Protection Program ("PPP") loans. This rapid influx of pandemic relief to individuals and businesses, combined with rapid growth in the number of new claims for UI, PUA, and other public benefits created a "perfect

environment" for fraud that was widely reported in the American media,[5] and that led to a flood of warnings from government agencies and expert nongovernmental organizations about major increases in malicious cyber activity and financial fraud, including fraud targeting government unemployment benefits and consumer banking and credit services.[6] Reporting during the early months of the pandemic also noted the major increases in fraudulent financial activity had, predictably, caused a corresponding increase in demand on customer service phone lines, causing many agencies and companies to hire additional customer service representatives.[7] Bank of America nonetheless failed to take reasonable measures to prepare for, prevent, or respond to the readily foreseeable transactional fraud as relates to its BOA-DUA Debit Cards and Accounts.

F.    **BOA's Evasive and Ineffectual Response Prior to Benefits Recipients' Fraud Claims**

46.    Bank of America's ineffective response to the rampant fraud has taken various forms, as detailed herein, including failing to employ reasonable procedures for monitoring, detecting, stopping, and notifying Plaintiff and Class Members about highly suspicious transactions in their Accounts; not answering the customer service phone lines it advises BOA-

---

[5] Ari Shapiro & Martin Kaste, "The Pandemic Creates A Perfect Environment For New Types Of Fraud," *NPR All Things Considered* (May 21, 2020), https://www.npr.org/2020/05/21/860584461/the-pandemic-creates-a-perfect-environment-for-new-types-of-fraud (reporting experts saying that there was a "bonanza" and "gold rush right now" in pandemic-related financial crimes); Steve Inskeep & Martin Kaste, Washington State Hit Hard by Unemployment Fraud, *NPR Morning Edition* (May 22, 2020) ("scams thriving nationwide in the uncertain conditions created by the pandemic," including hundreds of millions of dollars lost by Washington state to fraudulent unemployment claims)
[6] *See, e.g.*, National Governor's Association, *Memorandum To: All Governors Re: COVID-19 and Cybersecurity* at 1 (Apr. 28, 2020) ("State agencies, critical infrastructure sectors, and the general public are experiencing waves of COVID themed malicious cyber activity."); Greg Iacurci, "If there's coronavirus relief money, scammers will try and steal it," *CNBC* (May 6, 2020), https://www.cnbc.com/2020/05/06/scammers-are-looking-to-steal-your-coronavirusrelief-money.html ("Federal agencies like the IRS, Federal Trade Commission, Social Security Administration and FBI have warned consumers and business owners in recent weeks to be vigilant as fraudsters try to take advantage of them during the coronavirus pandemic," including by targeting government financial relief such as unemployment benefits); U.S. Dept. of Labor Press Release, *U.S. Department Of Labor Issues Guidance And Reminders To States To Ensure Integrity Of Unemployment Insurance Programs* (May 11, 2020), https://www.dol.gov/newsroom/releases/eta/eta20200511-1 (announcing new "targeted guidance and reminders . . . to help states guard against fraud and abuse of their unemployment insurance systems"); Mike Baker, "Feds Suspect Vast Fraud Network Is Targeting U.S. Unemployment Systems," *The New York Times* (May 16, 2020), available at https://www.nytimes.com/2020/05/16/us/coronavirusunemployment-fraud-secret-service-washington.html
[7] *See, e.g.*, Baker, *supra* note 9 (phone calls reporting fraud "flooded" Washington state unemployment benefits agency and "forced the state to hire more people to answer the phones")

DUA Debit Cardholders to call; establishing "customer service" procedures that frustrate and obstruct Plaintiff's and Class Members' efforts to file fraud claims; opening fraud claims and then promptly closing them without conducting a reasonable and good faith investigation; unilaterally reversing "permanent" credits previously granted for unauthorized transactions without reasonable and good faith basis and without advance notice to the BOA-DUA Debit Cardholder; failing to extend provisional credit to BOA-DUA Debit Cardholders without reasonable and good faith basis; and indefinitely freezing or blocking the Accounts of BOA-DUA Debit Cardholders who call Bank of America to report third-party fraud on their Accounts.[8]

### i. BOA's Policy and Practice of Making it Unreasonably Difficult for Cardholders to Report Unauthorized Transactions

47.     The Bank has prevented many Plaintiff and Class Members from being able to report fraud in a timely manner, or even at all. Notwithstanding the foreseeable spike in calls that the Bank knew or should have known would inevitably accompany the dramatic increase in unemployment benefits recipients, the Bank failed to appropriately staff its customer service call centers in a manner that would enable the Bank to honor its contractual commitments under the DUA-Bank Contract and to provide reasonable levels of assistance to the predictably large volume of BOA-DUA Debit Cardholders seeking assistance during this pandemic.

48.     As a result, Plaintiff and Class Members attempting to report fraud or to inquire about potential fraud have been kept on hold for hours, have been disconnected without warning, have waited long periods of time to speak with someone only to be told to call back later, have been transferred to various departments with no apparent end or sent to voicemail, have had to

---

[8] Kenny Choi, "Victims of Bank of America Bank Debit Card Fraud Tell Stories of Fake Charges, Long Waits, Closed Claims," *KPIX–CBS SF Bay Area* (Dec. 22, 2020), available at https://sanfrancisco.cbslocal.com/2020/12/22/victims-of-bank-of-america-edd-debit-card-fraud-tell-stories-of-closed-claimsfrustration-loss/.

deal with unhelpful automated agents, and have unsuccessfully attempted to reach the Bank by email.

> **i.    BOA's Policy and Practice of Denying Unauthorized Transaction Claims Without Reasonable Investigation or Explanation**

49.    Even when Plaintiff and Class Members have been able to report unauthorized transactions to the Bank, the Bank has had a policy and practice of automatically and summarily denying the fraud claims of BOA-DUA Debit Cardholders without adequate investigation or explanation. Pursuant to this policy and/or practice, the Bank has failed to provide provisional credit to tens or hundreds of thousands of Cardholders who filed a fraud claim. Instead of investigating the claim and providing provisional credit as required by law, the Bank sent those Cardholders a form letter, often dated the very same day or within a day or two of the Cardholder's report of the unauthorized transactions, closing the Cardholder's claim. The form letter states, "Your claim has been closed because we believe the account or the claim have been the subject of fraud or suspicious activity. Any temporary credit that was applied to your account related to this claim, including any related reimbursement of fees, has been or will be debited from your account and reflected in your available balance, if any." The form letter does not provide any individualized information explaining what the Bank's investigation, if any, entailed, nor does it explain the basis for the Bank's determination.

50.    The Bank's form letter provides a telephone number that Cardholders should call if they wish to "request that [the Bank] reopen your claim for further consideration," but BOA-DUA Debit Cardholders who have called the Bank at that number to make such a request have been given erroneous information or have been told they cannot be helped. Even those who have submitted detailed documentation to the Bank substantiating their fraud claims, such as sworn statements, police reports, and documentary proof of their whereabouts at the time the fraudulent

transactions occurred (e.g., that they were nowhere near the ATM from which their funds were withdrawn) have been often ignored and forced to go months without receiving any update from the Bank regarding the status of their claim. Some who submitted additional information simply received yet another form letter from the Bank summarily reaffirming without explanation the Bank's original decision denying the fraud claim. Even those whose claims have been reopened were not issued provisional credit pending completion of the Bank's investigation and were not guaranteed that the Bank's investigation will be completed within a certain number of days as required under Regulation E.

51.    The Bank adopted its policy and practice of automatically denying the fraud claims of BOA-DUA Debit Cardholders in an attempt to circumvent its obligations under EFTA and Regulation E, which require the Bank to issue provisional credit if it has not completed a good-faith investigation within 10 business days of a Cardholders' report of fraud, to complete a good-faith investigation of the claim within no more than 45 days, and thereafter to issue permanent credit absent a reasonable basis for believing no fraud occurred. In implementing this unlawful policy and practice, the Bank sought to protect its own financial interests at the expense of legitimate claimants whose life-sustaining public benefits had been stolen.

52.    The Bank also implemented its policy and practice of automatically denying the fraud claims of BOA-DUA Debit Cardholders retroactively by rescinding "permanent" credits that the Bank had previously paid. Thus, many Class Members who previously had been "permanently" credited with the amount of the funds that had been stolen from them and who had been previously informed by the Bank that their fraud claims were favorably resolved suddenly and without explanation had that same amount debited from their BOA-DUA Debit Card Accounts, sometimes leaving their Accounts with a negative balance. As a result, when those Cardholders received their

next DUA benefits payment deposit into the BOA-DUA Debit Card Account, they were not actually able to access those benefits because the new DUA benefits payments were credited against the negative balance in their Account that resulted from the Bank's actions.

> **i.    BOA's Policy and Practice of Automatically and Indefinitely Freezing Cardholders' Account When They Report Unauthorized Transactions**

53.    On information and belief, in and around October 2020, the Bank implemented an additional policy and practice of responding to BOA-DUA Debit Cardholders who report unauthorized transactions by automatically and indefinitely freezing or blocking their BOA-DUA Debit Card Accounts without any prior notice, explanation, or opportunity to be heard. A Cardholder whose Account is frozen or blocked cannot access any funds in their Account; moreover, the Bank will not accept DUA benefits payments from DUA for deposit into a frozen Account. Thus, many Class Members have had the experience of reporting that they were *the victims* of fraudulent transactions and receiving assurances from the Bank that it will cancel their old BOA-DUA Debit Card and issue a new one, only to discover that their new BOA-DUA Debit Card is useless because the Bank has frozen (or blocked) their BOA-DUA Debit Card Account.

54.    The Bank implements this policy and practice of freezing or blocking Accounts without any prior notice, thus depriving such Cardholder of access to any DUA benefits that may have been in the Account at the time. Moreover, the Bank's practice of freezing or blocking Accounts cuts off the affected BOA-DUA Debit Cardholders' access to any continuing benefits that the DUA deposits into the Cardholder's blocked Account or attempts to deposit into the Cardholder's frozen Account—DUA benefits to which DUA has determined the Cardholder is entitled. As a result, many BOA-DUA Debit Cardholders who are the victims of third-party fraud and who turn to the Bank for help, find themselves indefinitely deprived of access to all their DUA benefits and treated as if they are the criminals.

55.    Bank of America has frozen many Cardholders' Accounts for months on end, without providing them any information as to when their Accounts will be unfrozen or how they can facilitate that unfreezing. Some BOA-DUA Debit Cardholders whose Accounts are frozen in this manner have eventually received notice from the Bank weeks or months after the fact, but that notice simply states, "It has been determined that there may be irregular, unauthorized, or unlawful activities involved with the prepaid debit card issued to you. As a result . . . a freeze (or hold) has been placed on your account." The notice states that once the Bank freezes your Account, you "will be unable to use the prepaid debit card or access the money in your account," and that the Account "will not be available to receive any additional benefits that may be issued to you by [DUA]." The notice further states, "If a conclusion is reached that there is no irregular, unauthorized, or unlawful activity on your account, your account will be unfrozen and your balance will become available in accordance with the terms of the card account agreement and state agency guidelines," but the notice does not advise the affected Cardholder as to what steps they can take to regain access to their Account.

56.    After Bank of America has frozen a BOA-DUA Debit Card Account in response to a report of transactional fraud, the Bank has had a policy and practice of telling BOA-DUA Debit Cardholders they are required to re-establish their identity and re-verify eligibility with the Bank or with DUA as a condition of unfreezing the Account—even if DUA itself has not raised any question regarding the individual's identity or benefits eligibility. Bank of America has imposed this onerous and unreasonable condition on Cardholders who report third-party transactional fraud regardless of whether there is a reasonable basis for suspecting them of having committed benefits eligibility fraud, and despite knowing that DUA's call center has been completely overwhelmed

by the surge in unemployment benefits recipients throughout the pandemic and that many individuals who call DUA will never get through.

57.     Even after Cardholders have complied with this onerous and unreasonable Bank-imposed requirement of contacting DUA and obtaining confirmation from DUA that they either do not need to re-verify or have successfully re-verified their benefits eligibility, Bank of America still has not unfrozen their BOA-DUA Debit Card Account, continuing without explanation to deprive Cardholders of access to their DUA benefits and refusing to process their fraud claims or refund their stolen money, sometimes for months longer.

>        **i.     BOA's Policy and Practice of Denying Reasonable Customer Service to Cardholders Seeking Assistance with Fraud Claims and the Unfreezing of Accounts**

58.     Desperate and confused, BOA-DUA Debit Cardholders whose fraud claims have been summarily denied and/or whose BOA-DUA Debit Card Accounts have been suddenly frozen have spent months calling the Bank's customer service hotline, to no avail.

59.     The Bank has failed to appropriately staff its customer service call centers in a manner that would allow it to honor its contractual commitments under the DUA-Bank Contract and to provide reasonable levels of assistance to the predictably large volume of BOA-DUA Debit Cardholders seeking assistance during this pandemic. Further, the Bank has a policy and practice of failing to provide its customer service representatives the tools or authority necessary to assist Cardholders who call seeking assistance in resolving their fraud claims or unfreezing their Accounts.

60.     Although the Bank at some point in the Fall of 2020 hired additional customer service agents, on information and belief those newly hired customer service agents are not adequately trained and are not empowered to investigate or resolve fraud claims, and the number

of customer service agents continued to be too low to handle incoming calls, resulting in hours-long wait times if Cardholders can get through at all.

61.     Despite the Bank's promise of 24/7 customer service, Plaintiff and Class Members have found themselves repeatedly kept on hold, sometimes for hours, waiting to speak to a live agent. Plaintiff and Class Members have routinely been disconnected, hung up on, and treated rudely by overworked and overwhelmed agents. They often spend hours on hold with customer service, despite the Bank having represented in its Cardholder Agreement that telephoning is the best way of keeping possible losses down. Even when Plaintiff and Class Members finally reach customer service representatives, those representatives are unable to offer any meaningful assistance, often conveying false information or contradicting one another.

62.     The Bank's representatives also often provide erroneous information to Plaintiff and Class Members regarding the source of their Account freezes. Countless Class Members have been told that the Bank has no control over the freeze, that DUA is the entity responsible for the freeze, and that only DUA has the power to unfreeze their BOA-DUA Debit Card Accounts. But when Class Members call DUA, DUA informs them that it has no control over their BOA-DUA Debit Card Accounts and that the freeze is entirely within the Bank's control. Even when Class Members re-verify their identity with DUA, DUA confirms their eligibility for DUA benefits, and DUA or Class Members convey this information to the Bank, the Bank still does not unfreeze their Accounts. In some cases, DUA has resumed paying benefits to Class Members through paper checks upon specific request by a Cardholder, but those Class Members have continued to be unable to access funds in their BOA-DUA Debit Card Accounts, which remain frozen.

63.     Bank of America's inadequate response to BOA-DUA Debit Cardholders' issues with fraud on their Cards and Accounts results from the Bank's failure to adequately staff its

customer-service and fraud-investigation departments, and from Bank procedures that are designed to, or that the Bank knows or reasonably should know will, frustrate and obstruct Cardholders' efforts to submit their claims and to obtain reimbursement under EFTA and the Bank's "Zero Liability" policy.

64.    Bank of America's disregard for BOA-DUA Debit Cardholders' issues with fraud and the Bank's inadequate response contradicts the representations it made to the State in its proposal to administer the DUA public benefits program, in which the Bank represented it would provide stellar customer service to every caller.

### i.    BOA's Policies and Practices Continue to Harm Cardholders

65.    On information and belief, the Bank continues to freeze the Accounts of thousands if not tens of thousands of Class Members each month, thus depriving Class Members of access to critical unemployment and other public benefits to which the DUA has found they are entitled and on which they and their families depend for food, shelter, and other basic life necessities.

66.    Moreover, Class Members continue to experience unauthorized transactions on their BOA-DUA Debit Card Accounts.

### G.    Plaintiff's Experience with DUA and Bank of America

67.    Plaintiff Sam Eggiman is a citizen and resident of Massachusetts. On June 1 of 2020, due to the COVID-19 pandemic, he applied for pandemic-related unemployment benefits with the State of Massachusetts DUA.

68.    On June 2, 2020, Plaintiff's claim for unemployment benefits was approved by the DUA. In or around August of 2020, Plaintiff received a BOA-DUA Debit Card from Bank of America. The Debit Card was not equipped with industry standard EMV chip technology.

69.    On or about December 8, 2020, Plaintiff attempted, unsuccessfully, to activate his BOA-DUA Debit Card to access his DUA-issued benefits. Plaintiff called the customer support number provided by BOA in the Cardholder Agreement and was told that: (1) the card had been activated on November 11, 2020; (2) the card had thereafter been reported as stolen or lost; (3) the address on the Account had been changed from Groton, Massachusetts to an address in Vero Beach, Florida; and  (3) that a new card had been requested and sent to the Florida address.

70.    BOA further informed Plaintiff that his DUA benefits funds, *totalling over $10,000.00*, that had been directed into his Account had been nearly entirely depleted, leaving a remaining balance of less than $10.00. BOA then advised Plaintiff to contact the DUA to report a fraud.

71.    At this time, Plaintiff was 19 years old and attending his first semester of college. His mother, Lisa Gosselin, offered to assist him in resolving his BOA-DUA Debit Account issues.

72.    The next day, on December 9, 2020, Mrs. Gosselin contact the DUA who instructed her on how to report the fraud on the Massachusetts Government website, to which Plaintiff complied.

73.    On December 10, 2020, Mrs. Gosselin contacted BOA to follow up on her son's fraud report. BOA responded that his Account had been frozen by the DUA, and they were "unable to talk to him because the funds have been frozen." BOA advised Mrs. Gosselin to contact the DUA in order to unfreeze his Account.

74.    Between this time and early January of 2021, Mrs. Gosselin had approximately over thirty phone conversations with the DUA and BOA, respectively. In each of these conversations, Mrs. Gosselin was provided inaccurate or conflicting information, with each party shifting the responsibility of addressing Plaintiff's issues to the other. In response to these frustrations, on

January 6, 2021, Mrs. Gosselin reached out via email to the DUA and to the Massachusetts State Auditor Susanne Bump, asking for assistance and guidance. She received no response to these emails.

75.     On or about the week of January 18, 2021, BOA stated that Plaintiff would need to go in person to a local BOA branch, call the BOA-DUA Debit Card customer support line with a manager from that branch, and verify his identity with two forms of government-issued identification. Plaintiff did so at the BOA branch in Littleton, Massachusetts. Plaintiff was told to follow up with BOA the next week and that his Account would now be unfrozen.

76.     By February of 2021, Mrs. Gosselin contacted BOA again, who confirmed that Plaintiff's account was still frozen. She was now told that the only way to unfreeze his Account was through the Massachusetts DUA. Mrs. Gosselin explained that Plaintiff had already gone to the Littleton BOA branch as advised and verified his identity. BOA ignored this verification as "irrelevant." Mrs. Gosselin requested to speak to a manager or a supervisor, but was told there "there is no one."

77.     Through March of 2021, Mrs. Gosselin continued to contact the DUA and BOA multiple times a week, pleading for a resolution or some clear steps towards remedying the issues and unfreezing Plaintiff's Account. No progress was made, and Plaintiff's Account remained frozen, depriving Plaintiff of access to his benefits entitlement.

78.     Frustrated and anguished by the unhurried rate of progress on Plaintiff's claim, Mrs. Gosselin contacted the office of Sheila Harrington, Plaintiff's local state representative on March 29, 2021. Lauren Rooney, a legislative aide at the Representative's office, was provided all the details of Plaintiff's benefits, the subsequent fraud, and the increasingly challenging process to

unfreeze Plaintiff's account. Ms. Rooney agreed to assist Plaintiff in procuring a resolution and reached out to the DUA.

79.    On April 14, 2021, prompted by a contact from Ms. Rooney, Michael (last name unknown) from the DUA contacted Mrs. Gosselin and informed her that the DUA had approved Plaintiff's identification verification and sent that information to BOA. Michael contended that this would result in Plaintiff's account being unfrozen, although would not commit to a timeline as to when BOA would receive this information or when the Account would be unfrozen.

80.    By May of 2021, no resolution had been reached and Plaintiff's BOA-DUA Account remained frozen. On May 24, 2021, Mrs. Gosselin contacted BOA and was told that Plaintiff's Account would remain frozen and that only the DUA would be able to unfreeze it. Mrs. Gosselin reached back out to Ms. Rooney at Sheila Harrington's office seeking assistance, who then followed up with the DUA. Ms. Rooney received a response from the DUA that entirely conflicted with BOA's representations over the phone, providing that "[t]his is not accurate information provided by BOA, BOA is the only entity in control of the claimant's PUA debit card account. *BOA is the entity that decides whether to freeze the claimant's account*. Our team has sent the claimant's information to BOA to rectify the situation. As indicated previously I do not have an accurate time frame as to when the issue will be rectified."

81.    Throughout June of 2021, Mrs. Gosselin continued to call BOA to resolve the issues and gain Plaintiff access his benefits to no avail. His account remained frozen. On July 9, 2021, Mrs. Gosselin spoke with BOA, and on this occasion, BOA instructed that in order to take any steps to address the frozen account, they would need Plaintiff to verify the address on the BOA-DUA Account. Mrs. Gosselin provided Plaintiff's address at 547 Martins Pond Road, Groton, MA 01450, the same address on his benefits claim to DUA and the same address associated with the

account when the claim was approved in June of 2020. Nonetheless, the BOA agent responded that the Groton address was incorrect, and therefore they would not be able to assist any further. Mrs. Gosselin explained that pursuant to the fraud committed on Plaintiff's account in November-December (which he had reported in December, 2020), the defrauder had changed the address on the Account and that the only details relating to this fraudulent change that had been provided to Plaintiff was that the Account had been changed to an address in Vero Beach, Florida. Despite having gone in person to a BOA branch and verifying his identity with two pieces of government-issued ID back in January of 2021, BOA nonetheless refused to assist any further, stating that until the DUA updated and provided the correct address, their hands were proverbially tied.

82.    After this forestalling conversation with BOA, Mrs. Gosselin again reached out to Ms. Rooney at Sheila Harrington's office for support. On August 20, 2021, Mrs. Gosselin received an email from Ms. Rooney with an update from the DUA regarding the address-related barriers. DUA stated that "[t]he address [BOA is] requesting has been on the account since it was opened and there is no history of any other addresses on the account [referring to the Groton address]. There is nothing for us to change and we have no way to communicate with BOA that the address is valid. The BOA card was requested when the account was opened[,] and BOA issued the card to that address."

83.    The same day, Mrs. Gosselin contacted BOA to follow up regarding the information provided in the DUA's response, asserting that the DUA was reporting having the correct address on file, outlining the difficulties in the process over the previous eight months, and attempting to finally unfreeze the Account from which Plaintiff had been deprived access all this time. BOA responded that their agreement for delivering DUA benefits (referencing the DUA-Bank Contract) contained specific terms and conditions that forbid BOA from making any change

to the address associated with the account. BOA represented that in fact, their system "grayed out" the address field, precluding them from making any edits. This was surprising to both Plaintiff and Mrs. Gosselin, particularly considering that the address had been changed by the fraud in late 2020 and the DUA had confirmed that they had no other address in their records associated with the account. Frustrated, Mrs. Gosselin again reached out to Ms. Rooney, but the DUA reaffirmed that the issue was not on their end, and that any remedy would have to be provided by BOA.

84.    Since December of 2020, Plaintiff has been frozen out of his account and has been deprived of any access to his state-issued unemployment benefits. At no point in time has BOA offered reimbursement for the funds stolen from the fraud in late 2020, nor has it offered any provisional credit of those funds while it made its fraud investigation. At no point in time has BOA provided adequate notice or an opportunity to be heard regarding its deprivation of his state-issued benefits. Throughout this time, Plaintiff has been subjected to dramatically ineffective customer service, misinformation, and no clear remedy to regain access to his DUA benefits.

85.    As a direct consequence of the Bank's actions, Plaintiff has suffered economic harm, frustration, and emotional distress.

## V.    CLASS ALLEGATIONS

86.    Class Representative Plaintiffs bring this lawsuit individually and as a class action pursuant to Federal Rule of Civil Procedure 23, seeking declaratory and injunctive relief and damages on behalf of a class defined as follows (the "Class"):

> **All Massachusetts residents who were Bank of America DUA Debit Cardholders at any time between January 1, 2020 and the present ("Class Period"), and whose eligibility for benefits has not been revoked by DUA for failure to establish valid identity.**

87.    Plaintiffs further seek declaratory and injunctive relief, restitution, disgorgement, and statutory and actual damages on behalf of the following Subclasses:

**Claim Denial Subclass**: All Class Members who, during the Class Period, gave the Bank notice of a claim that an unauthorized transaction had occurred on their Account ("Claim") and whose Claim the Bank closed or denied without a reasonable basis.

**Failure to Issue Provisional Credit Subclass**: All Class Members who, during the Class Period, gave the Bank notice of a claim that an unauthorized transaction had occurred on their Account ("Claim") and were not issued provisional credit on their Account when the Bank's claim investigation lasted more than 10 business days.

**Failure to Issue Permanent Credit Subclass**: All Class Members who, during the Class Period, gave the Bank notice of a claim that an unauthorized transaction had occurred on their Account ("Claim") and were not issued permanent credit on their Account when the Bank's claim investigation lasted more than 45 business days.

**Credit Rescission Subclass**: All Class Members who, during the Class Period, received provisional or permanent credit from the Bank in connection with their Claim, which the Bank rescinded more than 45 days after the Class Member gave notice of the Claim.

**Account Freeze Subclass**: All Class Members whose BOA-DUA Debit Card Account the Bank froze during the Class Period and later unfroze or later converted from frozen to blocked status and then unblocked.

**Failure to Unfreeze Subclass**: All Class Members whose BOA-DUA Debit Card Account the Bank froze or blocked during the Class Period and did not unfreeze or unblock after DUA instructed the Bank to unfreeze the Class Member's Account or informed the Bank that DUA had verified the Class Member's identity.

**Security Breach Subclass**: All Class Members whose Card, Account, or other personal information in the possession of the Bank or its agents was, during the Class Period, accessed or taken by a third party without the Class Member's consent.

**EMV Chip Subclass**: All Class Members whose BOA-DUA Debit Card, during the Class Period, did not include an EMV chip, and whose Card, Account, or other personal information was accessed or taken from the Card by a third party without the Class Member's consent.

88.     Plaintiffs reserve the right under Rule 23 to amend or modify the Class and Subclass descriptions and/or add one or more subclasses based on information obtained in the course of this litigation.

89.     All Class Members have suffered or are threatened with imminent injury during the Class Period, caused by Defendants' wrongful acts and omissions, as alleged herein.

90.     This action has been brought and may properly be maintained as a class action against Defendants pursuant to the following provisions of Rule 23.

**NUMEROSITY (R. Civ. P. 23(a)(1))**

91.     The members of the Class and each Subclass are so numerous that their individual joinder is impracticable. Bank of America provided hundreds of thousands, if not millions, of DUA benefits recipients with BOA-DUA Debit Cards that used only outdated magnetic stripe technology (no EMV chip) and subjected these individuals to an undue risk of experiencing fraudulent transactions on their BOA-DUA Debit Cards and Accounts. The identities of, and contact information for, those individuals may readily be obtained through the Bank's business records or the business records of its affiliated entities. Tens of thousands of BOA-DUA Debit Cardholders reported unauthorized transactions to the Bank and had their unauthorized transaction claims summarily closed or denied by the Bank without explanation and without issuance of provisional or permanent credit. In addition, tens of thousands of BOA-DUA Debit Cardholders have had their Cards and Accounts frozen or blocked by the Bank.

**COMMONALITY and PREDOMINANCE (R. Civ. P. 23(a)(2) and 23(b)(3))**

92.     Many questions of law and fact are common to the Class and Subclasses. These questions predominate over any questions affecting only individual Class Members. These common legal and factual issues include, but are not limited to:

i.   Whether the Bank had or has a policy and/or practice of denying BOA-DUA Debit Cardholders' unauthorized transaction claims without having conducted a good-faith investigation that results in the Bank having a reasonable basis for believing that the Cardholder authorized or benefitted from the transaction;

ii.  Whether the Bank had or has a policy and/or practice of denying BOA-DUA Debit Cardholders' unauthorized transaction claims without providing the Cardholder with a report of the results of the Bank's investigation of the claim that includes a written explanation of the Bank's findings;

iii. Whether the Bank had or has a policy and/or practice of not provisionally crediting the Accounts of BOA-DUA Debit Cardholders in the amount of an unauthorized transaction claim within 10 business days of the Bank receiving notice of the claim, and without having conducted a good-faith investigation that results in the Bank having a reasonable basis for believing that the Cardholder authorized or benefitted from the transaction;

iv.  Whether the Bank had or has a policy and/or practice of not permanently crediting the Accounts of BOA-DUA Debit Cardholders in the amount of an unauthorized transaction claim after 45 business days from the Bank receiving notice of the claim, and without having conducted a good-faith investigation that results in the Bank having a reasonable basis for believing that the Cardholder authorized or benefitted from the transaction;

v.   Whether the Bank had or has a policy and/or practice of knowingly and willfully denying BOA-DUA Debit Cardholders' unauthorized transaction claims;

vi.     Whether the Bank had or has a policy and/or practice of automatically freezing the BOA-DUA Debit Card Accounts of Cardholders who report unauthorized transactions;

vii.    Whether the Bank had or has a policy and/or practice of failing to provide its customer service representatives with the training, tools, or authority necessary to reasonably assist BOA-DUA Debit Cardholders who call about resolving their unauthorized transaction claims or unfreezing their Accounts;

viii.   Whether the Bank violated or is violating EFTA and Regulation E by having a policy and/or practice of denying BOA-DUA Debit Cardholders' unauthorized transaction claims without having conducted a good-faith investigation that results in the Bank having a reasonable basis for believing that the Cardholder authorized or benefitted from the transaction;

ix.     Whether the Bank violated or is violating EFTA and Regulation E by having a policy and/or practice of denying BOA-DUA Debit Cardholders' unauthorized transaction claims without providing the Cardholder with a report of the results of the Bank's investigation of the claim that includes a written explanation of the Bank's findings;

x.      Whether the Bank is violating or violated EFTA and Regulation E by having a policy and/or practice of not provisionally crediting the Accounts of BOA-DUA Debit Cardholders in the amount of an unauthorized transaction claim within 10 business days of the Bank receiving notice of the claim, and without having conducted a good-faith investigation that results in the Bank having a reasonable

basis for believing that the Cardholder authorized or benefitted from the transaction;

xi.    Whether the Bank is violating or violated EFTA and Regulation E by having a policy and/or practice of not permanently crediting the Accounts of BOA-DUA Debit Cardholders in the amount of an unauthorized transaction claim after 45 business days from the Bank receiving notice of the claim, and without having conducted a good-faith investigation that results in the Bank having a reasonable basis for believing that the Cardholder authorized or benefitted from the transaction;

xii.    Whether the Bank breached its duties to Plaintiff and Class Members, including by using outdated fraud-prevention technology in its BOA-DUA Debit Cards and Accounts, by not adequately monitoring BOA-DUA Debit Cards and Accounts for suspicious activity, by not conducting appropriate follow-up or investigation when unauthorized transaction claims were made, by failing to comply with EFTA and its own "Zero Liability" policy, and by otherwise failing to make Plaintiffs and Class Members whole for unauthorized transactions on their Accounts;

xiii.    Whether the Bank acted negligently in its hiring, supervision, and retention of subcontractors and agents who have access to Plaintiff's and Class Members' sensitive Cardholder Information;

xiv.    Whether above referenced subcontractors and agents were the Bank's actual, apparent, or ostensible agent in its negligent hiring, supervision, and retention of

employees who mishandled or misappropriated Plaintiff's and Class Members' sensitive Cardholder Information;

xv.    Whether the Bank should be enjoined from freezing BOA-DUA Debit Card Accounts or from failing to take the reasonable steps necessary to avoid causing additional future harm to Plaintiffs and Class Members as the result of the Bank's acts and omissions alleged herein;

xvi.    Whether the Bank's conduct alleged herein constituted unfair or deceptive acts or practices in the conduct of trade or commerce in violation of the Massachusetts CPA; and

xvii.    Whether the Bank should pay damages and interest or provide restitution, reimbursement, and/or other relief to Plaintiff and Class Members.

**TYPICALITY (R. Civ. P. 23(a)(3))**

93.    Plaintiff's claims are typical of the claims of the members of the putative Class. Plaintiff, like all other members of the putative Class, sustained economic and other damages as a result of the Bank's wrongful acts and omissions as alleged herein. Plaintiff and members of the putative Class were and are similarly or identically harmed by the Bank's same unlawful, deceptive, unfair, systematic, and pervasive pattern of misconduct as alleged herein.

**ADEQUACY (R. Civ. P. 23(a)(4))**

94.    Plaintiff will fairly and adequately represent and protect the interests of the putative Class Members and have retained competent and qualified counsel with extensive experience in complex litigation and class action litigation. There are no material conflicts between the claims of Plaintiff and the members of the putative Class that would make class certification

inappropriate. Counsel for the putative Class will vigorously prosecute the claims of all putative

Class Members.

## APPROPRIATENESS OF A CLASS ACTION (R. Civ. P. 23(b))

95.    This action is properly maintained as a class action pursuant to Rule 23(b) of the

Federal Rules of Civil Procedure for the following reasons:

i.    Class Action Status (Rule 23(b)(1)): Class action status is appropriate under Rule

23(b)(1)(A) because prosecution of separate actions by each of the thousands of

putative Class Members would create a risk of establishing incompatible standards

of conduct for the Bank and inconsistent results for Class Members. Class action

status is also appropriate under Rule 23(b)(1)(B) because prosecution of separate

actions by putative Class Members would create a risk of adjudication with respect

to individual members of the Class that, as a practical matter, would be dispositive

of the interests of other members not parties to this action or would substantially

impair or impede their ability to protect their interests.

ii.    Declaratory and Injunctive Relief (Rule 23(b)(2)): Certification under Rule

23(b)(2) is appropriate because the Bank acted or refused to act on grounds

generally applicable to the putative Class, thereby making appropriate final

injunctive, declaratory, or other appropriate equitable relief with respect to the

putative Class as a whole.

iii.    Predominance and Superiority (Rule 23(b)(3)): Certification of the Subclasses

under Rule 23(b)(3) is appropriate because questions of law or fact common to

putative Class and Subclass Members predominate over any questions affecting

only individual members, and because class action treatment is superior to the other available methods for the fair and efficient adjudication of this controversy.

iv.    Issue Certification (Rule 23(c)(4)): Certification of issues of liability and statutory and treble damages under Rule 23(c)(4) is appropriate because these issues are common to putative Class Members and resolution of these common issues on a classwide basis will materially advance the disposition of the litigation as a whole.

96.    The Class and each Subclass is ascertainable from the Bank's own records, and there is a well-defined community of interest in the questions of law or fact alleged herein since the rights of each Class Member and each Subclass Member were infringed or violated in the same or similar fashion.

## VI.    CAUSES OF ACTION

### <u>FIRST CAUSE OF ACTION</u>

**VIOLATIONS OF THE ELECTRONIC FUNDS TRANSFER ACT, 15 U.S.C. § 1693,** *et seq***; 12 C.F.R. § 1005.1,** *et seq.*

97.    Plaintiff repeats and incorporates by reference each and every allegation set forth above, as though fully set forth here.

98.    Plaintiff brings this claim on his own behalf and on behalf of the Class and applicable Subclasses.

99.    Plaintiff brings this cause of action pursuant to the United States Electronic Funds Transfer Act, 15 U.S.C. § 1693, *et seq.* ("EFTA") and 12 C.F.R. § 1005.1–1005.20 (Regulation E of the EFTA).

100.    Plaintiff and Class members provided notice to Bank of America within 60 days after Bank of America sent a period statement reflecting an unauthorized transaction (which is an

"error" under Regulation E), thereby triggering the error resolution requirements of 12 C.F.R. § 1005.11.

101.    Bank of America violated Regulation E, 12 C.F.R. § 1005.11, because it failed to provide provisional credit to Plaintiff and Class members accounts relating to error investigations that could not be resolved within 10 business days.

102.    In situations where Bank of America has violated Regulation E by failing to provisionally Plaintiff's and Class members' accounts, Bank of America has failed to conduct good faith investigations into the unauthorized transactions that Plaintiff and Class members have reported or attempted to report by, among other things, failing to provide Plaintiff and Class members reasonable access to Bank of America's customer service, and failing to provide Plaintiff and Class members meaningful assistance when they have been able to reach customer service. Plaintiff and Class members are therefore entitled to treble damages under 15 U.S.C. § 1693f(e).

103.    In situations where Bank of America has violated Regulation E by failing to provisionally recredit Plaintiff's and Class members' accounts, Bank of America has not had a reasonable basis for believing that the account was not in error. Instead, Bank of America: (a) has made it unreasonably difficult for BOA-DUA Account cardholders to report suspected unauthorized transactions, and (b) has not used at all relevant times, and is not currently using, the resources and procedures necessary to resolve the levels of fraud that are occurring on Plaintiff's and Class members' accounts. This demonstrates that Bank of America has been unable or unwilling to form a reasonable basis for believing an account was not in error. Plaintiff and Class members are therefore entitled to treble damages under 15 U.S.C. § 1693f(e).

104.    Bank of America knowingly and willfully concluded that Plaintiff's and Class members' accounts were not in error when such conclusion could not reasonably have been drawn

from the evidence available to Bank of America at the time of its investigation. Plaintiff and Class members are therefore entitled to treble damages under 15 U.S.C. § 1693f(e).

105.    Bank of America violated Regulation E by failing to limit Plaintiff's and Class members' liability as required by 12 C.F.R. § 1005.6(b).

106.    Plaintiff provided notice to Bank of America within two business days after learning of the fraudulent transactions that occurred on his DUA Bank of America account. Under 12 C.F.R. § 1005.6(b)(1), Plaintiff's and similarly-situated Class members' liability is capped at $50 in these circumstances. Despite this cap on liability, Bank of America has subjected Plaintiff and similarly-situated Class members' to over $50 in liability.

107.    Under 12 C.F.R. § 1005.6(b)(2), $500 is the maximum liability when an accountholder does not provide notice to the financial institution within two business days after learning of a suspected unauthorized transaction.  Bank of America has subjected Plaintiff and Class Members to far greater than $500 in liability through its wrongful conduct as alleged herein.

108.    Regarding any Class members who did not provide Bank of America with actual notice within two business days of learning of a suspected unauthorized transaction, Bank of America was on constructive notice, under 12 C.F.R. § 1005.6(b)(5)(iii), of widespread unauthorized electronic funds transfers from BOA-DUA Debit Card Accounts since the beginning of the Covid-19 pandemic. Since that time, countless unauthorized fund transfers have occurred and continue to occur from BOA-DUA Accounts. The volume of calls from BOA-DUA Debit cardholders to Bank of America's customer service to report unauthorized transactions has been, and continues to be, so great that BOA-DUA Debit cardholders routinely wait on hold for multiple hours. The widespread fraud specifically targeting BOA-DUA Debit cardholders has been widely

reported in the media and has been the subject of significant attention from California legislators addressing a similar issue in their EDD system.

109.    In no event should any class member be liable for over $500 of damages under 12 C.F.R. § 1005.6. Bank of America has violated 12 C.F.R. § 1005.6 by imposing hundreds and thousands of dollars of liability on unemployed Massachusetts residents.

110.    As a direct and proximate result of Bank of America violating Regulation E, Plaintiff and Class members have lost substantial amounts of money.

111.    Plaintiff, on behalf of himself and the Class and the applicable subclasses, seek an injunction barring Bank of America from denying provisional credit and denying fraud claims without having timely conducted a good faith investigation of the alleged fraud and without a reasonable basis for believing that the transaction was authorized, and barring Bank of America from otherwise violating EFTA and Regulation E. Plaintiff, on behalf of herself and the Fraud Claim Denial Subclass, further seek the following relief: (a) actual damages with interest; (b) restitution of all DUA benefits funds improperly debited by Bank of America; (c) statutory damages; (d) treble damages pursuant to 15 U.S.C. § 1693f(e); and (e) incidental and consequential damages suffered due to their inability to pay bills or otherwise use their unemployment funds.

## SECOND CAUSE OF ACTION

### NEGLIGENCE AND NEGLIGENCE PER SE

112.    Plaintiff repeats and incorporates by reference each and every allegation set forth above, as though fully set forth here.

113.    Plaintiff brings this claim on his own behalf and on behalf of the Class and applicable Subclasses.

114.    Plaintiff and Bank of America have a special relationship that gives rise to the Bank's duties to Plaintiff and other Class Members to act reasonably to: (a) safeguard their unemployment and other DUA benefits; including by employing reasonable practices and procedures to protect the confidentiality and security of their Cardholder Information and by employing reasonable practices and procedures to monitor for, detect, stop, and promptly notify Cardholders about suspicious transactions involving their Cards and Accounts; (b) protect them from unreasonable interference with their right and ability to continue to collect, receive, and access the DUA benefits to which they were entitled; (c) provide them reasonable and adequate notice that their BOA-DUA Debit Cards and Accounts were at risk of being subject to unauthorized use or had been subjected to unauthorized use; (d) ensure that the Bank's customer service staffing levels, technology, and operations were capable of providing Plaintiff and Class Members reasonably timely and effective customer service, including to address those customers' concerns about fraudulent or unauthorized transactions related to their BOA-DUA Debit Cards or Accounts; (e) provide Plaintiff and Class Members reasonable and adequate notice that their BOA-DUA Debit Cards and Accounts were at risk of being subject to unauthorized use or had been subjected to unauthorized use; (f) timely and adequately investigate and resolve Plaintiff's and Class Members' claims regarding unauthorized or fraudulent transactions; and (g) extend to Plaintiff and Class Members provisional credit in cases where Bank of America failed to timely resolve their fraud-related claims.

115.    Bank of America breached its duty to Plaintiff and Class Members by, among other things: (a) failing to maintain, store, share, and transmit Cardholder Information in a secure manner; (b) failing to issue Plaintiff and Class Members BOA-DUA Debit Cards with EMV chips, despite having been well aware for years of the risks associated with magnetic stripe technology;

(c) failing to protect Plaintiff and Class Members from fraudulent access by unauthorized third parties to the funds paid into their BOA-DUA Debit Card Accounts, including by providing timely and accurate warnings of suspicious activity in those Accounts; (d) failing to respond to the dramatic increase in DUA benefits and DUA benefits recipients caused by or related to the COVID-19 pandemic by issuing BOA-DUA Debit Cards with EMV chips to all new and existing BOA-DUA Debit Cardholders and by taking other reasonably prudent security measures to prevent fraudulent and unauthorized transactions; (e) failing to ensure its customer service operation was capable of providing reasonably timely and effective assistance to Plaintiff and Class Members, including when they were victims of fraudulent or unauthorized transactions; (f) failing to give reasonable and adequate notice to Plaintiff and Class Members that their DUA benefits were and remain at risk of being vulnerable to fraudulent and unauthorized transactions; (g) failing to process BOA-DUA Debit Cardholders' claims regarding fraudulent or unauthorized transactions in a reasonably timely and adequate manner, including by unreasonably automatically freezing BOA-DUA Debit Card Accounts without prior notice, reasonable investigation, or an opportunity to be heard; and (h) failing to extend provisional credit to Plaintiff and Class Members when Bank of America failed to resolve their claims regarding fraudulent or unauthorized transactions in a reasonably timely and adequate manner.

116.    Bank of America's misconduct was intended to adversely affect Plaintiff and Class Members, who rely on Bank of America to access their unemployment and other DUA benefits through their BOA-DUA Debit Cardholder accounts managed exclusively by Bank of America.

117.    Bank of America's misconduct concerning its failure to safeguard BOA-DUA Debit Cardholders' funds is contrary to industry standards, which prescribe using EMV chip technology in debit cards.

118.    Bank of America's misconduct concerning its failure to adequately protect Plaintiff's and Class Members' data violates its obligations under the Gramm-Leach-Bliley Act, 15 U.S.C. § 6801 et seq., and regulations promulgated thereunder (see, e.g., 16 C.F.R. Parts 313, 314), which prohibit the Bank from disclosing its customers' nonpublic personal information to a nonaffiliated third party and require the Bank to take reasonable steps to protect the security and confidentiality of its customers' nonpublic personal information against anticipated security threats or hazards and unauthorized access or use, and customary industry practice, as well as its own policies and procedures for its *non-DUA* debit and credit cards and accounts, each of which are secured through EMV chip technology. Plaintiff and Class Members are within the classes of persons that each of these statutes are designed to protect, and Bank of America's conduct caused the precise harm to Plaintiff and Class Members that this statute was designed to prevent.

119.    Bank of America's failure to comply with the Gramm-Leach-Bliley Act constitutes negligence per se.

120.    The harms inflicted upon Plaintiff and other Class Members were  reasonably foreseeable because the Bank was and is well aware of the security risks associated with magnetic stripe technology, and knew or should have known that its customer service resources and/or procedures were insufficient to consider, evaluate, and appropriately resolve issues stemming from the significant increase in DUA benefits and DUA benefits recipients due to the sharp rise in unemployment in the State of Massachusetts caused by or related to the COVID-19 pandemic, as well as the sharp, well-publicized rise in financial fraud during the COVID-19 pandemic, both of which would foreseeably lead to an increased demand for customer service by Plaintiff and Class Members for all purposes, including for the purpose of reporting and attempting to resolve claims of fraudulent or unauthorized transactions. It was a near certainty, which the Bank knew or should

have known, that Plaintiff and Class Members would suffer significant and irreparable harm as a result of the Bank's morally blameworthy actions that caused tens of thousands of unemployed Massachusetts residents to lose access to past, present, and future unemployment insurance benefits for which they had been found eligible and on which they relied for their survival during the pandemic.

121.    As a direct and proximate result of Bank of America's misconduct, Plaintiff and Class Members have been deprived of their DUA benefits and have failed to receive accrued interest thereon.

122.    Plaintiff, on behalf of himself and the Class and applicable Subclasses, seek declaratory and injunctive relief and damages and interest thereon.

**THIRD CAUSE OF ACTION**

**NEGLIGENT HIRING, SUPERVISION AND RETENTION**

123.    Plaintiff repeats and incorporates by reference each and every allegation set forth above, as though fully set forth here.

124.    Plaintiff brings this claim on his own behalf and on behalf of the Class and applicable Subclasses.

125.    Bank of America hired various subcontractors to provide customer service, call center operations, and other services for the Bank and to perform various functions and services under the terms of the DUA-Bank Contact. These subcontractors and their employees and agents, including Customer Service Representatives, have access to highly sensitive and confidential BOA-DUA Debit Cardholder Information, including Plaintiff's and Class Members' personally identifiable information, Card and Account data, and other financial data and information. Acting as the Bank's agent, subcontractors negligently hired hundreds if not thousands of employees *en*

*masse* to perform services for the Bank without ever conducting a background check on these individuals. Bank of America granted these unvetted agents access to BOA-DUA Debit Cardholders' highly sensitive and confidential Cardholder Information. Neither Bank of America itself nor its subcontractors provided proper training or supervision to these agents regarding handling and maintaining the confidentiality of Cardholder Information.

126.    Given the Bank's and its subcontractors' failure to conduct background checks or to take other reasonable security measures in hiring employees *en masse* to serve as Bank of America Customer Service Representatives and other Bank agents, it was reasonably foreseeable that such unvetted agents would compromise the security of Plaintiff's and Class Members' confidential Cardholder Information.

127.    Bank of America's and its subcontractors' negligent hiring, training, supervision, and retention of Customer Service Representatives and other agents who have access to highly confidential Cardholder Information harmed and continues to harm Plaintiff and Class Members by subjecting them to unreasonable risk of fraud and exfiltration of their Cardholder Information and enabled a series of internal data breaches committed by subcontractor employees within the scope of their employment, which harmed the Class Members whose information was compromised.

128.    Under the terms of the DUA-Bank Contract, Bank of America is required to track and report all incidents or security breach exposures of confidential information that may have compromised a BOA-DUA Cardholder's confidential Cardholder Information or the integrity and secure delivery of DUA Benefits to the Cardholder. Bank of America thus knew or should have known that its subcontractors were or became unfit or incompetent to perform the work for which they were hired, including as a result of its negligent hiring, training, supervision, and retention of

agents with access to confidential Cardholder Information, yet Bank of America continued to retain its subcontractors to perform services under the DUA-Bank Contract.

129.    BOA's subcontractors at all relevant times have been the actual, apparent, and ostensible agents of Bank of America, who has ratified its subcontractors' actions.

130.    As a direct and proximate result of Bank of America's and its agents' misconduct, Plaintiff and Class Members have been deprived of their DUA benefits and have failed to receive accrued interest thereon.

131.    Plaintiff, on behalf of himself and the Class and applicable Subclasses, seek declaratory and injunctive relief and damages and interest thereon.

## FOURTH CAUSE OF ACTION

### BREACH OF CONTRACT

132.    Plaintiff repeats and incorporates by reference each and every allegation set forth above, as though fully set forth here.

133.    Plaintiff brings this claim on his own behalf and on behalf of the Class and applicable Subclasses.

134.    Plaintiff and Class Member entered into a Cardholder Agreement with the Bank that requires the Bank to administer DUA benefits to them through BOA-DUA Debit Card Accounts.

135.    The Cardholder Agreement provides, among other things: "Under the Bank of America 'zero liability' policy, you may incur no liability for unauthorized use of your Card up to the amount of the transaction, provided you notify us within a reasonable time of the loss or theft of your Card, Card number or PIN or its unauthorized use, subject to the following terms and conditions." The Cardholder Agreement further provides: "We will determine whether an error

occurred within 10 business days after we hear from you — and will correct any error promptly. If we need more time, however, we may take up to 45 days to investigate your complaint or question. If we decide to do this, we will credit your Account within 10 business days for the amount you think is in error, so that you will have the money during the time it takes us to complete our investigation."

136.    The Cardholder Agreement also provides that the Bank "will add funds to your Account . . . in accordance with instructions from the DUA" and that "[f]unds are available for your use on the day we have been instructed by the DUA to fund your Account." Those also limit the circumstances under which the Bank may deprive BOA-DUA Debit Cardholders of access to their funds by freezing their DUA Debit Card Accounts. As relevant here, the Cardholder Agreement provides that if the Bank "suspect[s] irregular, unauthorized, or unlawful activities may be involved" with the Account, it may freeze the Account, but only "pending an investigation of such suspected activities."

137.    Plaintiff and Class Members performed all or substantially all of the material requirements that their Cardholder Agreement with Bank of America imposed on them, and they fulfilled all conditions precedent to Bank of America's performance, including, among other things, by contacting or attempting to contact Bank of America to reimburse them for fraudulently appropriated funds within the time specified in the Cardholder Agreement.

138.    Bank of America breached its promises to Plaintiff and Class Members in its Cardholder Agreement by, among other things: (a) failing to timely and reasonably investigate and resolve their fraud claims; (b) failing to reimburse them for unauthorized transactions; (c) failing to provide them with provisional credit when the Bank's investigation into their fraud claims exceeds 10 business days; (d) failing to limit their liability for unauthorized transactions; (e)

freezing or blocking their BOA-DUA Debit Card Accounts without a reasonable basis for suspecting irregular, unauthorized, or unlawful activities in the Account, and beyond the length of time necessary for a reasonable investigation; (f) freezing or blocking their BOA-DUA Debit Card Accounts for reasons other than those specified in the Cardholder Agreement; (g) failing to make funds available to them for their use on the day the Bank has been instructed by the DUA to fund their Accounts; and (h) otherwise failing to make funds available to them in accordance with DUA's instructions.

139.    Plaintiff and Class Members were harmed by Bank of America's conduct and have suffered actual damages in an amount equal to the difference in the value of the banking services for which they provided valuable consideration and the banking services they received.

140.    Plaintiff, on behalf of himself and the Class and applicable Subclasses, seek declaratory and injunctive relief and damages and interest thereon.

## FIFTH CAUSE OF ACTION

## BREACH OF IMPLIED CONTRACT

141.    Plaintiff repeats and incorporates by reference each and every allegation set forth above, as though fully set forth here.

142.    Plaintiff brings this claim on his own behalf and on behalf of the Class and applicable Subclasses.

143.    Bank of America agreed to and was obligated to take reasonable steps to ensure that Plaintiff and Class members' BOA-DUA Debit Cards were secure against unauthorized transactions and that any claims regarding unauthorized transactions were adequately investigated and resolved.

144.    All parties understood that such protections and customer service obligations were integral and essential to Bank of America's business.

145.    Bank of America was obligated to provide Plaintiff and Class Members with BOA-DUA Debit Card services that were suitable for their intended purpose of preserving and accessing DUA benefits as needed, rather than providing debit card services that failed to take reasonable steps to safeguard their money, failed to warn or notify them in the event that their BOA-DUA Debit Cards or Accounts were at risk of unauthorized use, and/or failed to adequately investigate or resolve claims regarding unauthorized transactions.

146.    Bank of America did not take reasonable steps to protect Plaintiff's and Class Members' deposited funds from unauthorized transactions or to adequately investigate or resolve claims regarding unauthorized transactions. In fact, Bank of America willfully violated those interests by choosing to issue BOA-DUA Debit Cards with cheaper, outdated magnetic stripe technology, which it knew to be uniquely vulnerable to fraud, rather than using the same EMV chip technology that the Bank has included in all of its consumer credit cards and debit cards for more than six years, for the express purpose of protecting against fraud.

147.    Because Bank of America failed to take reasonable steps to protect BOA-DUA Debit Cardholders' funds from being appropriated through unauthorized transactions and failed to take reasonable steps to timely or adequately respond to claims regarding unauthorized transactions, Bank of America breached its implied contracts with Plaintiffs and Class Members.

148.    Bank of America's failure to fulfill its obligations to take reasonable steps to protect its BOA-DUA Debit Cardholders' funds from being appropriated through unauthorized transactions, and its failure to take reasonable steps to timely or adequately respond to claims

regarding unauthorized transactions resulted in Plaintiffs and Class Members receiving banking services that were of less value than they provided consideration for.

149.    Plaintiff, on behalf of himself and the Class and applicable Subclasses, seek declaratory and injunctive relief and damages and interest thereon.

## SIXTH CAUSE OF ACTION

## BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

150.    Plaintiff repeats and incorporates by reference each and every allegation set forth above, as though fully set forth here.

151.    Plaintiff brings this claim on his own behalf and on behalf of the Class and applicable Subclasses.

152.    There is a covenant of good faith and fair dealing implied in every contract and every implied contract. This implied covenant requires each contracting party to refrain from doing anything to injure the right of the other to receive the benefits of the agreement. To fulfill its covenant, a party must give at least as much consideration to the interests of the other party as it gives to its own interests.

153.    The covenant of good faith and fair dealing implied in the Bank's Cardholder Agreement with Plaintiff and Class Members obligated the Bank, at a minimum: (a) to take reasonable and necessary steps to safeguard Plaintiff's and Class Members' DUA benefits, including in light of the foreseeable and actual rise in the number of BOA-DUA Debit Cardholders and the amount of financial fraud caused by or related to the COVID-19 pandemic; (b) to ensure that its customer service operation was capable of providing reasonably adequate and effective assistance to BOA-DUA Debit Cardholders who experienced or claimed to have experienced fraud on their BOA-DUA Debit Cards or Accounts; (c) to warn or notify Plaintiff and Class Members if

their public benefit funds were subject to, or at risk of being subject to, actual or suspected unauthorized use; (d) to timely and adequately investigate and resolve claims of unauthorized transactions involving Plaintiff's and Class Members' DOA-BUA Debit Cards or Accounts; (e) to extend provisional credit to Plaintiff and Class Members in cases where their fraud claims are not timely resolved; (f) to freeze or block BOA-DUA Debit Card Accounts only to protect them from third-party fraud and only for the period necessary to conduct a reasonable investigation into whether third-party fraud occurred; (g) to make DUA benefits deposited into BOA-DUA Debit Card Accounts immediately available to Cardholders and not to freeze or block Accounts without a reasonable basis for believing that the Cardholders themselves have committed fraud; and (h) to not freeze or block Accounts out of concern for the Bank's own potential liability for third-party fraud.

154. Bank of America breached the implied covenant of good faith and fair dealing by, among other things: (a) failing to take reasonable and necessary steps to safeguard Plaintiff's and Class Members' DUA benefits, including but not limited to (i) failing to issue BOA-DUA Debit Cards with EMV chip technology, (ii) failing to employ reasonable practices and procedures to secure Plaintiff's and Class Members' Cardholder Information and other sensitive personal information that could be used by third parties to effect unauthorized transactions, (iii) failing to employ reasonable practices and procedures to monitor for, detect, stop, and promptly notify Plaintiff and Class Members about suspicious transactions involving their BOA-DUA Cards and Accounts (including but not limited to transactions that were highly suspicious because they were made during the pandemic at a significant distance from where the Plaintiff or Class Member resided, were made close in time but geographically far apart, or were significantly inconsistent with the Plaintiff or Class Member's Card and Account transaction history and past Account access

behaviors), and (iv) failing to promptly issue BOA-DUA Debit Cards with EMV chips and to increase its efforts with respect to securing personal information, fraud monitoring, and otherwise safeguarding benefits in light of the foreseeable and actual rise in the number of BOA-DUA Debit Cardholders and the amount of financial fraud caused by or related to the COVID-19 pandemic; (b) failing to ensure its customer service operations were capable of providing effective assistance to BOA-DUA Debit Cardholders who experienced fraud on their BOA-DUA Debit Card or Account, including during the COVID-19 pandemic; (c) failing to warn or notify BOA-DUA Debit Cardholders that their DUA benefits were and remain subject to, or at risk of being subject to, actual or suspected unauthorized use; (d) failing to timely or adequately process and investigate BOA-DUA Debit Cardholders' claims regarding unauthorized transactions; (e) failing to extend provisional credit in cases where BOA-DUA Debit Cardholders' fraud claims are not timely resolved; (f) freezing or blocking BOA-DUA Debit Card Accounts without a reasonable basis for believing that the Cardholders themselves had committed fraud, and for longer than it would reasonably take to investigate any such belief; (g) failing to provide BOA-DUA Debit Cardholders any reasonable means of contesting the Bank's purported basis for freezing their BOA-DUA Debit Card Accounts or for otherwise getting their Accounts unfrozen; and (h) freezing or blocking BOA-DUA Debit Card Accounts not to protect the Cardholders, but rather to protect the Bank itself, from liability for third-party fraud.

155.    As a direct and proximate result of Bank of America's breaches of the implied covenant of good faith and fair dealing, Plaintiff and Class Members have suffered actual losses and damages.

156.    Plaintiff, on behalf of himself and the Class and applicable Subclasses, seek declaratory and injunctive relief and damages and interest thereon.

## SEVENTH CAUSE OF ACTION

## VIOLATION OF THE MASSACHUSETTS CONSUMER PROTECTION ACT, G.L. c. 93A, § 2, *et seq.*

157.    Plaintiff repeats and incorporates by reference each and every allegation set forth above, as though fully set forth here.

158.    Plaintiff brings this claim on his own behalf and on behalf of the Class and applicable Subclasses.

159.    At all relevant times, Defendant Bank of America was engaged in trade or commerce within the Commonwealth of Massachusetts.

160.    The Massachusetts Consumer Protection Act ("CPA") prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." G.L. c. 93A, § 2(a). Pursuant to the Massachusetts CPA, the General Regulations promulgated by the Massachusetts Attorney General provide that "an act or practice is a violation of M.G.L. c. 93A, § 2 if: (1) It is oppressive or otherwise unconscionable in any respect; or (2) Any person or other legal entity subject to this act fails to disclose to a buyer or prospective buyer any fact, the disclosure of which may have influenced the buyer or prospective buyer not to enter into the transaction; or (3) It fails to comply with existing statutes, rules, regulations or laws, meant for the protection of the public's health, safety, or welfare promulgated by the Commonwealth or any political subdivision thereof intended to provide the consumers of this Commonwealth protection; or (4) It violates the Federal Trade Commission Act, the Federal Consumer Credit Protection Act or other Federal consumer protection statutes within the purview of M.G.L. c. 93A, § 2." 940 C.M.R. § 3.16.

161.    Bank of America's "unfair" acts and business practices include, among other things: (a) failing to transfer or store BOA-DUA Cardholder and Account information in a secure

manner; (b) failing to issue BOA-DUA Debit Cards with EMV chips, despite having for years been aware of the risks associated with magnetic stripe technology and despite knowing the heightened vulnerability of BOA-DUA Debit Cardholders and their Accounts and those Cardholders' heightened interest in securely, reliably, and timely accessing their DUA benefits; (c) failing to respond to the rise in demand for DUA benefits caused by or related to the COVID-19 pandemic by issuing EMV chip cards; (d) falsely representing to Plaintiff, Class Members, and DUA that it would provide "best-in-class" fraud monitoring and that it would remain "at the forefront of fraud and data security strategies benefiting the DUA and [DUA's] claimants"; (e) failing to protect Plaintiff and Class Members from unauthorized transactions, including by failing to use readily available EMV chip technology in its BOA-DUA Debit Cards rather than outdated magnetic stripe technology that the Bank knew was susceptible to fraud; (f) failing to employ reasonable practices and procedures to monitor for, detect, stop, and promptly notify Plaintiff and Class Members about suspicious transactions involving their Cards and Accounts, including but not limited to transactions that were highly suspicious because they were made during the pandemic at a significant distance from where the Plaintiff or Class Member resided, were made close in time but geographically far apart, or were significantly inconsistent with the Plaintiff or Class Member's Card and Account transaction history and past Account access behaviors; (g) failing to provide reasonable or adequate customer service assistance to Plaintiff and other Class Members who complained of fraud, despite representing to them that such assistance would be available "24/7," and despite the Bank's awareness of rampant third-party fraud on BOA-DUA Debit Cards and Accounts; (h) establishing "customer service" procedures designed to frustrate and obstruct efforts by Plaintiff and Class Members to file their fraud claims; (i) failing to adequately investigate and resolve Plaintiffs' and Class Members' claims of unauthorized

transactions in a timely manner despite the Bank's promised "Zero Liability" policy for unauthorized transactions; (j) failing to extend provisional credit to Plaintiffs and Class Members in cases where the Bank was unable to timely investigate and resolve fraud claims; (k) automatically denying Plaintiff's and Class Members' claims of unauthorized transactions without investigation, explanation, or reasonable basis; (l) rescinding, without explanation or legitimate basis, "permanent" credits the Bank had previously paid to BOA-DUA Debit Cardholders upon determining fraud had occurred in their Account; (m) freezing and/or blocking BOA-DUA Debit Card Accounts without a reasonable basis for believing that the Cardholders themselves had committed fraud, and for longer than it would reasonably take to investigate any such belief, all while failing to provide Cardholders any advance notice, prompt post-freeze notice, or any reasonable means of contesting the purported basis for the Account freeze; (n) freezing and/or blocking BOA-DUA Debit Card Accounts not to protect the Cardholders but to protect the Bank's own interests; and (o) failing to provide reasonable or adequate customer service to Plaintiff and other Class Members seeking assistance in obtaining reimbursement for third-party fraud on their Accounts or in accessing their frozen Accounts.

162.    Bank of America's acts, omissions, and conduct as alleged herein are "unfair" under the CPA because those acts, omissions, and conduct offend public policy and constitute immoral, unethical, oppressive, and unconscionable activities that caused substantial injury, including to Plaintiff and Class Members. The harm caused by Bank of America's conduct outweighs any potential benefits attributable to such conduct. There were reasonably available alternatives to further the Bank's legitimate business interests, including issuing BOA-DUA Debit Cards with EMV chips and creating and implementing procedures and resources adequate to

timely conduct good-faith investigations into reported unauthorized transactions and to otherwise timely resolve reports of fraudulent activity on BOA-DUA Debit Card Accounts.

163.    Bank of America has engaged in "unfair" acts and business practices that by, as set forth herein, violating the Electronic Fund Transfers Act, 15 U.S.C. §1693, and Regulation E and its common law obligations. Bank of America has further engaged in "unlawful" acts and business practices by violating the (a) the Gramm-Leach-Bliley Act ("GLBA"), 15 U.S.C. § 6801 et seq., and regulations promulgated thereunder (see, e.g., 16 C.F.R. Parts 313, 314), which prohibit the Bank from disclosing its customers' non-public personal information to a non-affiliated third party and require the Bank to take reasonable steps to protect the security and confidentiality of its customers' non-public personal information against anticipated security threats or hazards and unauthorized access or use.

164.    The Bank is subject to the GLBA because it is a financial institution as defined under 15 U.S.C. § 6809(3)(A), and is subject to the GLBA Safeguards Rule, 16 C.F.R. Part 314, because it is a financial institution that handles and maintains non-public personal information, as defined by 16 C.F.R. § 313.3(n), including Plaintiff's and Class Members' non-public personal information. The Safeguards Rule, which implements Section 501(b) of the GLBA, 15 U.S.C. § 6801(b), requires financial institutions such as the Bank to protect the security, confidentiality, and integrity of customer information by developing, implementing, and maintaining a written comprehensive information security program that contains administrative, technical, and physical safeguards that are appropriate to the financial institution's size and complexity, the nature and scope of its activities, and the sensitivity of the customer information at issue, including by (a) identifying reasonably foreseeable internal and external risks to the security, confidentiality, and integrity of customer information, and assessing the sufficiency of any safeguards in place to

control those risks; (b) designing and implementing information safeguards to control the risks identified through risk assessment, and regularly testing or otherwise monitoring the effectiveness of the safeguards' key controls, systems, and procedures; (c) overseeing service providers by taking reasonable steps to select and retain service providers that are capable of maintaining appropriate safeguards for customer information, and requiring service providers by contract to implement such safeguards; and (d) evaluating and adjusting the information security program in light of the results of testing and monitoring, changes to the business operation, and other relevant circumstances. 16 C.F.R. § 314.3, 314.4.

165.    Throughout the Class Period, the Bank has violated each of the above requirements of the Safeguard Rule by failing to adequately secure Plaintiff's and Class Members' non-public personal information, including when the Bank transferred that information to DUA and to the Bank's service providers, and by failing to oversee its service providers' compliance with Safeguards Rule in connection with Plaintiff's and Class Members' non-public personal information. Specifically, the Bank failed to take adequate steps to evaluate whether its service providers, were capable of and actually were reasonably protecting Cardholders' non-public personal information. This failure violated the Safeguards Rule. On information and belief, the Bank also failed to identify reasonably foreseeable internal and external risks to the security, confidentiality, and integrity of customer information, and failed to assess the sufficiency of any its own and its service providers' safeguards in place to control those risks. These failures also violated the Safeguards Rule. As a result of the Bank's violations, Plaintiff's and Class Members' non-public personal information fell into criminal hands, depriving them of the DUA benefits to which they were lawfully entitled.

166.    As a result of Bank of America's violations of the CPA, Plaintiffs and Class Members have suffered injury in fact and lost money or property, including but not limited to the funds lost to fraud that have not been reimbursed, the lost time value of money not timely reimbursed by Bank of America, fees paid to Bank of America, and lost interest that would have accrued on funds during the period of time when the funds were unavailable due to Bank of America's failure to timely and adequately investigate claims of unauthorized transactions and other violations of the CPA.

167.    Defendant's conduct was and is willful, knowing, and in bad faith within the meaning of the Massachusetts CPA, G.L. c. 93A, § 9.

168.    Plaintiffs, on behalf of themselves and the Class and applicable Subclasses, seek damages, treble damages, restitution, disgorgement, attorneys' fees, costs, and other equitable relief, including injunctive relief (a) prohibiting the Bank from continuing its unfair and unlawful business practices, and (b) requiring the Bank to take reasonable measures to prevent future unauthorized use of BOA-DUA Debit Cards and Accounts, and (c) requiring the Bank to ensure timely and adequate processing of Cardholders' claims regarding unauthorized or fraudulent use of their Cards or Accounts.

## VII.    PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on his own behalf and on behalf of the Class, prays for the following relief:

(1)    For an order certifying the Class and Subclasses as defined above and such additional subclasses as may be appropriate, appointing Plaintiff as representative for the Class, and appointing Plaintiff's counsel as counsel for the Class;

(2)     For declaratory and preliminary and permanent injunctive relief prohibiting Bank of America from engaging in the wrongful conduct alleged herein, as necessary to remedy the violations alleged herein;

(3)     For an award of all recoverable compensatory, statutory, and other damages sustained by Plaintiff and the Class Members, including treble damages where authorized by law, disgorgement, unjust enrichment, restitution, a declaration that the Bank holds the Account funds in constructive trust for the benefit of Plaintiff and the Class Members, and all other available relief under applicable law, including but not limited to accrued interest for the periods during which Plaintiff and Class Members were deprived of funds in their BOA-DUA Debit Card Accounts due to unauthorized transactions;

(4)     For an award of punitive damages pursuant to applicable law;

(5)     For reasonable attorney's fees and expenses as permitted by G.L. c. 93A, § 9(3A) and any other applicable statute or law;

(6)     For taxable costs;

(7)     For pre- and post-judgment interest as allowed by law; and

(8)     For any other relief the Court deems just.

## VIII.    JURY TRIAL DEMANDED

Plaintiff demands a trial by jury on all issues so triable.

Dated: February 22, 2022

By: /s/ Kevin Crick
Kevin Crick, Esq.
BBO: 680950
Rights Protection Law Group, PLLC
100 Cambridge St., Suite 1400

Boston, MA 02114
Phone: (617) 340-9225
Fax: (888) 622-3715
k.crick@rightsprotect.com
*Attorney for Plaintiffs*

Yitzchak Zelman, Esq.
MARCUS & ZELMAN, LLC
701 Cookman Avenue, Suite 300
Asbury Park, New Jersey 07712
(732) 695-3282 telephone
(732) 298-6256 facsimile
*Attorney for Plaintiff*
***Pro Hac Vice Motion Forthcoming***