UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| SAM EGGIMAN, individually and on behalf of all others similarly situated, | * * * * | |
| Plaintiff, | * * | |
| v. | * * | Civil Action No. 1:22-cv-10298-ADB |
| BANK OF AMERICA, N.A., | * * | |
| Defendant. | * * * | |

**MEMORANDUM AND ORDER**

BURROUGHS, D.J.

Sam Eggiman ("Eggiman") filed this action against Bank of America, N.A. ("BANA"), alleging that BANA failed to properly administer Massachusetts Department of Unemployment Assistance ("DUA") unemployment insurance funds, in violation of various contractual, common law, and statutory obligations. [ECF No. 6 ("Am. Compl.")]. Eggiman brings these claims on behalf of himself and a putative statewide class of individuals who allege they were similarly harmed by BANA's conduct. [Id.]. Pending before the Court is BANA's motion to dismiss Eggiman's amended complaint, [ECF No. 7], which, for the reasons that follow, is GRANTED in part and DENIED in part.

I.      **BACKGROUND**

A.      **Factual Background**

The facts are drawn from the amended complaint. As it must, the Court "accept[s] the truth of all well-pleaded facts and draw[s] all reasonable inferences therefrom[.]" Grajales v. P.R. Ports Auth., 682 F.3d 40, 44 (1st Cir. 2012).

BANA is a financial institution headquartered in North Carolina and incorporated in Delaware.  [Am. Compl. ¶ 11].  In 2018, BANA reached an agreement with the DUA (the "DUA-BANA agreement") to provide debit card services to DUA benefits recipients.  [Id. ¶ 16]. Since then, the DUA has dispensed certain benefits, including pandemic unemployment assistance, via BANA-issued debit cards ("DUA Debit Cards").  [Id. ¶¶ 15–16].  Accounts are separate from regular BANA consumer accounts and can only receive deposits directly from the DUA.  [Id. ¶ 23].

In the DUA-BANA agreement, BANA represented that it would provide fraud monitoring and protection to all DUA debit cardholders, including a "Zero Liability" guarantee in the event of certain unauthorized transactions.  [Am. Compl. ¶¶ 17–20].  For example, a DUA Debit Card could not be used until activated, which required a customer to either visit the cardholder website or call BANA and provide both the card number and the last four digits of their Social Security number or government ID number.  [Id. ¶ 27].  In addition, BANA represented that it would offer its cardholders rapid customer service, citing its record of answering 70 percent of calls within 30 seconds.  [Id. ¶ 48].

In addition to the DUA-BANA agreement, BANA required each DUA debit cardholder to sign a Cardholder Agreement.  [Am. Compl. ¶¶ 7, 38, 40].  The Cardholder Agreement repeated many of the terms from the DUA-BANA agreement, including the Zero Liability policy.  [Id. at 38].[1]  It also represented that DUA debit cardholders could access customer service at any time to report unauthorized transactions and that BANA would then conduct an investigation within 10 business days.  [Id. ¶ 39].  If the investigation took longer than 10

---

[1] BANA's website included similar information, including reference to the "Zero Liability" policy.  [Am. Compl. ¶ 38].

business days, BANA promised to make the funds in question available to the cardholder while the investigation was ongoing.  [Id.].

The DUA Debit Cards do not possess the "dynamic," "industry-standard, fraud-preventing EMV chip technology that [BANA] has used on all its regular consumer customers' debit and credit cards since 2014."  [Am. Compl. ¶¶ 3, 32 (emphasis omitted)].  Instead, the cards have magnetic strips, which contains "static data" including the cardholder's name, the card number, and the card's expiration date.  [Id. ¶¶ 3, 29].  BANA's website acknowledges that EMV chip technology is the "security standard" in "many countries around the world."  [Id. ¶ 36].

Eggiman, a resident of Massachusetts, applied for Massachusetts DUA benefits on June 1, 2020, during the COVID-19 pandemic.  [Am. Compl.  ¶ 70].  His application was approved the next day, June 2, 2020.  [Id. ¶ 71].  Eggiman received his DUA Debit Card in or around August 2020, but he did not attempt to activate it for several months.  [Id. ¶¶ 71–72].  On December 8, 2020, Eggiman unsuccessfully sought to activate the card, but BANA informed him that it had already been activated.  [Id. ¶ 72].  According to BANA, that card had been activated and reported stolen, the account's address had been changed from Eggiman's Massachusetts address to a Florida address, and a new card had been sent to the Florida address.  [Id.].  Moreover, BANA stated that nearly all of the original funds available on the card, over $10,000 in unemployment benefits, had been withdrawn.  [Id. ¶ 73].  Shortly after, BANA told Eggiman that his account had been frozen.  [Id. ¶ 76].

Eggiman's mother offered to help him try to restore access to his funds, and she made over 30 phone calls to DUA and BANA during December 2020 and January 2021.  [Am. Compl. ¶¶ 74, 77].  She was often given incomplete or contradictory information, and both DUA and

BANA claimed that Eggiman's issues were the fault of the other party.  [Id. ¶ 77].  Despite these numerous phone calls, regular follow-up, in-person verification of Eggiman's identity, and the involvement of a state legislator, Eggiman's account remained frozen until the commencement of this case in February 2022.  [Id. ¶¶ 75–87].  Other putative class members have similarly spent many hours trying to unsuccessfully report fraud and have their funds restored.  [Id. ¶ 50].

BANA also failed to safeguard personally identifiable information.  [Am. Compl. ¶ 25].  BANA hired large numbers of new employees and contractors for its customer service and fraud reporting call centers but failed to properly conduct background checks or train staff on how to handle customer information.  [Id. ¶¶ 25, 63, 128].  As a result, Eggiman's and other putative class members' information was obtained by third parties.  [Id. ¶ 26].  This disclosure of information also precipitated the theft of the putative class members DUA benefits from their BANA accounts.  [Id. ¶¶ 26, 43].  Some of these putative class members had never activated their DUA Debit Cards and were thus never able to use them.  [Id. ¶ 27].

### B.    Procedural Background

Eggiman initiated this case on February 22, 2022.  [ECF No. 1].  On May 12, 2022, he filed the operative complaint, which alleges violations of the Electronic Funds Transfer Act ("EFTA") (Count I); negligence and negligence *per se* (Count II); negligent hiring, supervision, and retention (Count III); breach of contract (Count IV); breach of implied contract (Count V); breach of implied covenant of good faith and fair dealing (Count VI); and violations of the Massachusetts Consumer Protection Act, Chapter 93A (Count VII).  [Am. Compl. ¶¶ 100–73].  On July 8, 2022, BANA moved to dismiss the suit for lack of subject matter jurisdiction, pursuant to Rule 12(b)(1), and for failure to state a claim, pursuant to Rule 12(b)(6).  [ECF No. 7].  Eggiman opposed the motion on August 5, 2022, with respect to Counts II through VII.

[ECF No. 13].  Eggiman did not oppose the dismissal of Count I for violations of the ETFA.  [Id. at 19 n.3].[2]  BANA replied on August 23, 2022.  [ECF No. 16].

## II.        LEGAL STANDARD

Under Federal Rule of Civil Procedure 12(b)(6), "a complaint must provide 'a short and plain statement of the claim showing that the pleader is entitled to relief.'"  Cardigan Mountain Sch. v. N.H. Ins. Co., 787 F.3d 82, 84 (1st Cir. 2015) (quoting Fed. R. Civ. P. 8(a)(2)).  This pleading standard requires "more than labels and conclusions."  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007).  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citation omitted).  Rather, a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  Id. (quoting Twombly, 550 U.S. at 570).  When evaluating the sufficiency of a complaint, the Court "first must 'distinguish the complaint's factual allegations (which must be accepted as true) from its conclusory legal allegations (which need not be credited).'"  Cardigan Mountain Sch., 787 F.3d at 84 (quoting García-Catalán v. United States, 734 F.3d 100, 103 (1st Cir. 2013)) (further internal quotations omitted).  "Second, the court must determine whether the factual allegations are sufficient to support the reasonable inference that the defendant is liable for the misconduct alleged."  García-Catalán, 734 F.3d at 103 (internal quotation marks and citation omitted).  In conducting this analysis, the Court must accept all well-pled facts as true and analyze those facts in the light

---

[2] Because Eggiman has indicated that he does not oppose dismissal of that count, see [ECF No. 13 at 19 n.3], Defendant's motion to dismiss Plaintiff's Count I, Violations of The Electronic Funds Transfer Act, 15 U.S.C. § 1693, et seq; 12 C.F.R. § 1005.1, et seq., [ECF No. 7], is GRANTED.

most favorable to the plaintiff's theory, drawing all reasonable inferences in favor of the plaintiff.  U.S. ex rel. Hutcheson v. Blackstone Med., Inc., 647 F.3d 377, 383 (1st Cir. 2011).

Under Federal Rule of Civil Procedure 12(b)(1), a defendant may move to dismiss a complaint for lack of subject matter jurisdiction.  "[T]he party invoking the jurisdiction of a federal court carries the burden of proving its existence."  Murphy v. United States, 45 F.3d 520, 522 (1st Cir. 1995) (quoting Taber Partners, I v. Merit Builders, Inc., 987 F.2d 57, 60 (1st Cir. 1993)) (internal quotation marks omitted).  As with a Rule 12(b)(6) motion, "the district court must construe the complaint liberally, treating all well-pleaded facts as true and indulging all reasonable inferences in favor of the plaintiff."  Aversa v. United States, 99 F.3d 1200, 1209–10 (1st Cir. 1996) (citing Murphy, 45 F.3d at 522).

## III.      DISCUSSION

### A.      Count II (Negligence and Negligence *Per Se*) and Count III (Negligent Hiring, Supervision, and Retention)

 Eggiman advances three negligence theories.  First, Eggiman alleges that BANA owed him a duty of care as a consequence of the "special relationship" banks owe to their customers, which BANA breached by failing to appropriately safeguard against and investigate disclosure of customer information and fraud.  [Am. Compl. ¶¶ 117–18, 124].  Second, Eggiman states that BANA violated the Gramm-Leach-Bliley Act ("GLBA"), 15 U.S.C. § 6801 *et seq.*, which prohibits disclosure of customers' nonpublic personal information to nonaffiliated third parties and requires banks to take steps to secure that information.  [Id. ¶ 121].  Eggiman alleges that this statutory violation constitutes negligence *per se*.  [Id. ¶ 122].  Third, he alleges that BANA engaged in hiring practices that did not properly safeguard customer information and which constituted negligent hiring, supervision, and retention.  [Id. ¶¶ 128–33].

In its motion to dismiss, BANA argues these claims should be dismissed because: (1) Eggiman's injuries are purely economic and his claims are therefore barred by the economic loss doctrine, [ECF No. 8 at 20–21]; (2) BANA did not owe Eggiman a duty of care and, without more, no special relationship exists between a bank and a depositor, [id. at 21–22]; and (3) Eggiman has failed to sufficiently allege any link between the alleged breaches and the harm he suffered.  [Id. at 22].  The Court agrees with BANA that Eggiman's claims are barred by the economic loss doctrine.

In Massachusetts,[3] "[t]o state a claim for negligence, a plaintiff typically must allege damages beyond pure economic loss, as 'purely economic losses are unrecoverable . . . in the absence of personal injury or property damage.'"  Zoll Med. Corp. v. Barracuda Networks, Inc., 565 F. Supp. 3d 101, 106 (D. Mass. 2021) (second alternation in original) (quoting FMR Corp. v. Bos. Edison Co., 613 N.E.2d 902, 903 (Mass. 1993)).  The doctrine exists to avoid generating "open-ended negligence liability [for] anyone affected by a negligent act."  In re TJX Cos. Retail Sec. Breach Litig., 564 F.3d 489, 498 (1st Cir. 2009)  That is especially true when the parties are in contractual privity, because "the economic loss rule is founded on the theory that parties to a contract may allocate their risks by agreement and do not need the special protections of tort law

_____

[3] The parties do not directly address choice of law for Eggiman's tort claims, but both generally cite caselaw applying Massachusetts law, see [ECF No. 8 at 20–23; ECF No. 13 at 11–15; ECF No. 16 at 10–12].  "Under Massachusetts choice of law rules, 'tort claims are governed by the law of the state in which the injury occurred, unless another state has a more significant relationship to the cause of action.'"  Bergin v. Dartmouth Pharm., Inc., 326 F. Supp. 2d 179, 183 (D. Mass. 2004) (quoting Dunfey v. Roger Williams Univ., 824 F. Supp. 18, 21 (D. Mass. 1993)).  "The place where the injury occurred is the place where the last event necessary to make an actor liable for an alleged tort takes place."  Cohen v. McDonnell Douglas Corp., 450 N.E.2d 581, 585 (Mass. 1983) (internal quotation marks and citation omitted).  Here, where Plaintiff resides in Massachusetts and any injury would have occurred in Massachusetts, the Court finds that Massachusetts law applies.

. . . ." <u>Arthur D. Little Int'l, Inc. v. Dooyang Corp.</u>, 928 F. Supp. 1189, 1202 (D. Mass. 1996)

(internal quotation marks and citations omitted).[4]

BANA describes Eggiman's alleged injury, which is associated with being "deprived of [his] DUA benefits[,]" as "a textbook economic injury." [ECF No. 8 at 20–21]. Eggiman asserts that he has alleged non-economic injuries, including "denial of access to necessary information and wasted time[.]" [ECF No. 13 at 11]. In the data-breach context, courts applying Massachusetts law have characterized these types of injuries as economic losses. In <u>Cumis Insurance Society, Inc. v. BJ's Wholesale Club, Inc.</u>, 918 N.E.2d 36 (Mass. 2009), involving a data breach at a retail store that resulted in compromised credit card information, plaintiff credit unions alleged that the breach had caused them to suffer millions of dollars of losses from credit card fraud and the difficulties of "reissuing credit cards for all their compromised accounts . . . ." <u>Id.</u> at 42, 47. The Massachusetts Supreme Judicial Court concluded that these injuries were purely economic, and that the economic loss doctrine therefore barred the credit unions' negligence claims. <u>Id.</u> at 47. In a similar data-breach case, <u>TJX</u>, the First Circuit also concluded that "losses [that banks incurred] from reimbursing customers for fraud losses, monitoring customer[] accounts, and cancelling and reissuing cards" were not redressable under the economic loss doctrine. 564 F.3d at 492, 498–99. While the plaintiffs in both <u>Cumis</u> and <u>TJX</u> were financial institutions, this doctrine has been found to bar individuals from raising negligence claims for the same kinds of alleged harms. See <u>In re Target Corp. Customer Data Sec. Breach Litig.</u>, 66 F. Supp. 3d 1154, 1158, 1174 (D. Minn. 2014) (dismissing customers'

---

[4] Courts have recognized exceptions to the economic loss doctrine, which do not apply here, including economic losses arising from defamation and professional malpractice. See, e.g., <u>Portier v. NEO Tech. Sols.</u>, No. 17-cv-30111, 2019 WL 7946103, at *21 (D. Mass. Dec. 31, 2019), <u>report and recommendation adopted</u>, No. 3:17-CV-30111, 2020 WL 877035 (D. Mass. Jan. 30, 2020).

negligence claims for Massachusetts data breach because the economic loss doctrine barred recovery for "unauthorized charges; lost access to their accounts; and/or . . . misuse[] [of] their personal financial information," id. at 1158).[5]  Based on this caselaw, the Court concludes that Eggiman's alleged injuries, including "denial of access to necessary information and wasted time[,]" [ECF No. 13 at 11], are purely economic.

Eggiman argues that even if his injuries are purely economic, the economic loss doctrine does not apply because BANA had a duty to safeguard Eggiman's data, separate from the parties' contract.  [ECF No. 13 at 12].  In support of this argument, Eggiman first relies on Portier v. NEO Tech. Sols., 2019 WL 7946103.  In Portier, another session of this court considered an employer's data breach involving employees' personal information, including names, addresses, and full Social Security numbers and found that in the absence of on-point caselaw, Massachusetts courts would likely follow Pennsylvania caselaw that permits negligence claims to proceed on similar facts.  Id. at *18 (citing Dittman v. UPMC, 196 A.3d 1036, 1056 (Pa. 2018)).  Based on the Pennsylvania court's logic, the Portier court held that Massachusetts law likely does impose a common law duty on employers who affirmatively "collect and store employees' sensitive personal information"  due to the "special relationship" between that employer and its employees.  Id. at *20–21.  Because that proposed duty would be independent of contract, the Portier court reasoned that the economic loss rule would not apply.  Id. at *20.  Eggiman argues that this exception also bars application of the economic loss doctrine here.  The Court disagrees for several reasons.

---

[5] Courts have held the same outside of the data breach context.  See, e.g., Costa v. del La Femina, No. 20053536, 2006 WL 3201070, at *10 (Mass. Super. Ct. Oct. 17, 2006) ("The stress the plaintiff experienced [as a result of living with an unfinished addition on her home], as well as the time and effort she spent to get the addition finished, are economic losses which are not recoverable because of the economic loss rule.") (citation omitted).

First, the exception in <u>Portier</u> is inapplicable where, as here, the data breach at issue concerns precisely the data at the heart of the parties' contract.  See <u>Zoll Med. Corp.</u>, 565 F. Supp. 3d at 107 (declining to apply <u>Portier,</u> which concerned "information [that] was at most incidental to the object of the employment relationship," to a data breach at a storage facility because "the storage and protection of sensitive data was exactly what the parties contracted among themselves to do." (citations omitted)).  Second, unlike in <u>Portier</u>, Eggiman's alleged injuries relate to the disclosure of his financial information, not the disclosure of "personal and highly confidential information," including full Social Security numbers.  Cf. <u>Shedd v. Sturdy Mem'l Hosp., Inc.</u>, No. 2173-cv-00498C, 2022 WL 1102524, at *7–8 (Mass. Super. Ct. Apr. 5, 2022) (finding the economic loss doctrine did not apply to hospital data breach because, as in <u>Portier</u>, and unlike in <u>Cumis</u> and <u>TJX</u>, the breach involved "highly sensitive [personally identifiable information,]" including "confidential medical information" and full Social Security numbers, rather than the "unlawful and fraudulent use of credit card information.").[6]  Third, Eggiman does not identify—and this Court has not found—Massachusetts caselaw supporting the notion that a special relationship typically exists between a bank and its customers, cf. <u>Blais v. Warren Five Cents Sav. Bank</u>, No. 9218, 1993 WL 488429, at *2 (Mass. App. Ct. Nov. 22, 1993) ("The relationship of debtor and creditor, without more, does not establish a fiduciary relationship."), or when a financial institution "is not acting as an ordinary bank but as the exclusive distributor of cardholders' public benefits[,]" [ECF No. 13 at 13].  See <u>Zoll Med.</u>

---

[6] Eggiman alleges that BANA has failed to "store, share, transmit, or otherwise use" "personally identifiable information . . . in a reasonably secure manner[,]" [Am. Compl. ¶ 24], but does not specifically allege that any personal information, other than financial information, was disclosed. Cf. <u>Shedd</u>, 2022 WL 1102524, at *8 (explaining that "[g]iven the disclosure of social security numbers, financial information, and confidential medical information, the harm to the Plaintiffs is much greater" than the "unlawful and fraudulent use of credit card information").

Corp., 565 F. Supp. 3d at 107 (rejecting extension of Portier when "plaintiffs . . . cannot identify a similar [special] relationship with defendant.").

Additionally, Eggiman argues the GLBA imposes on BANA an independent duty, cognizable in tort.  [ECF No. 13 at 12].  Again, the Court disagrees.  Courts have recognized that the GLBA imposes an obligation on banks and that, in some states, violating this obligation may support a tort claim.  See Basham v. Pac. Funding Grp., No. 10-cv-00096, 2010 WL 2902368, at *3 (E.D. Cal. July 22, 2010) (noting that the GLBA obligates "financial institutions . . . to protect the security and confidentiality of their customers' nonpublic personal information, and requires such institutions regularly to disclose to their customers their information security policies" and that "[in California], the violation of a statute [like the GLBA] can be used to satisfy an element of a negligence cause of action" (citations omitted)).  Massachusetts, however, does not recognize a cause of action for negligence per se, "whereby . . . violation of a statute, without more, may establish a breach of duty."  Juliano v. Simpson, 962 N.E.2d 175, 180 (Mass. 2012) ("A duty of care must already exist before a plaintiff can use a defendant's statutory violation to support a claim of tort liability." (citations omitted)).  Where, as here, there is no independent basis for a tort duty, BANA's alleged violation of the GLBA does not create one.  Because the Court finds that Eggiman's injuries are purely economic and that there is no exception barring the application of the economic loss doctrine, BANA's motion to dismiss Counts II and III is GRANTED.[7]

---

[7] Because the Court finds that Eggiman has failed to allege any injuries for which the economic loss doctrine does not bar recovery, it does not address BANA's remaining arguments related to Eggiman's negligence claims.

**B.      Count IV (Breach of Contract)**

Eggiman advances three different theories of breach of contract.  First, he asserts that BANA had a "policy and practice" of freezing cardholder accounts without a reasonable basis, contrary to the Cardholder Agreement's requirements.  [Am. Compl. ¶¶ 55, 141].  Second, Eggiman alleges that BANA maintained those freezes longer than necessary to conduct a reasonable investigation.  See [id. ¶¶ 58, 141].  Third, he alleges that these freezes meant that BANA failed to uphold its responsibility to make his DUA funds available to him in a timely manner.  [Id. ¶ 141]; see also [ECF No. 13 at 4–6].[8]  BANA seeks to dismiss this claim for lack of subject matter jurisdiction, pursuant to Rule 12(b)(1), asserting that because BANA has reimbursed Eggiman's funds, this claim is moot and there is no longer a live case or controversy for the Court to rule on.  [ECF No. 8 at 16].  BANA also asserts that Eggiman has failed to state a claim upon which relief can be granted, pursuant to Rule 12(b)(6).  [Id. at 15].

i.      Lack of Subject Matter Jurisdiction

A claim is moot when "the issues presented are no longer live or when the parties lack a legally cognizable interest in the outcome[.]"  See Cruz v. Farquharson, 252 F.3d 530, 533 (1st Cir. 2001).  Under North Carolina law,[9] Eggiman's breach of contract claim may entitle him to both compensatory damages and nominal damages for his lack of access to his funds for over a year.  See, e.g., Comm. to Elect Dan Forest v. Emps. Pol. Action Comm., 853 S.E.2d 698, 725–26 (N.C. 2021) ("Actions for breach of contract can, in some circumstances, proceed on a theory

---

[8] These theories all implicate Section 2 of the Cardholder Agreement.  The Court agrees with BANA that Eggiman appears to have abandoned any arguments related to Sections 9 or 11 of the Cardholder Agreement.  See [ECF No. 16 at 5 n.1]; see generally [ECF No. 13].

[9] The parties agree the Cardholder Agreement is governed by North Carolina law.  See [ECF No. 8 at 18; ECF No. 13 at 8].  "It is well-settled law that parties may select by agreement the body of law that will govern their contractual disputes."  OrbusNeich Med. Co. v. Bos. Sci. Corp., 694 F. Supp. 2d 106, 113 (D. Mass. 2010) (citing Lambert v. Kysar, 983 F.2d 1110, 1118 (1st Cir. 1993)).

of nominal damages . . . in a contract action proof of breach alone is enough to avoid judgment

of nonsuit." (citation omitted)).[10]   BANA argues that the Court lacks subject matter jurisdiction

over Plaintiff's breach of contract claim because: (1) BANA recently reimbursed Eggiman for

the funds allegedly stolen from his account, thereby mooting the claim; and (2) any additional

recovery is barred by the plain language of the Cardholder Agreement.  [ECF No. 8 at 16].  The

Court disagrees.  The Cardholder Agreement states that BANA's liability under the policy is

limited to the "face amount of any unauthorized card transaction," [ECF No. 8-1 (Cardholder

Agreement) at 2],[11] and that BANA is "not liable for any claims of special, indirect or

consequential damages."  [Id.].  The Court finds that the plain terms of this contract provision do

not bar nominal damages and therefore, despite the reimbursement of his funds, Eggiman

continues to have an interest in his breach of contract claim.  The Court therefore declines to

dismiss Count IV for lack of subject matter jurisdiction.

ii.      Failure to State a Claim

Under North Carolina law, "[t]o state a claim for breach of contract, the complaint must

allege that a valid contract existed between the parties, that defendant breached the terms thereof,

the facts constituting the breach, and that damages resulted from such breach."  Grich v.

Mantelco, LLC, 746 S.E.2d 316, 319 (N.C. Ct. App. 2013) (quoting Claggett v. Wake Forest

Univ., 486 S.E.2d 443, 446 (N.C. Ct. App. 1997)).  "Contracts are interpreted according to the

---

[10] The same is true under Massachusetts law.  See, e.g., Formulatrix, Inc. v. Rigaku Automation, Inc., 344 F. Supp. 3d 410, 425, 429 n.7 (D. Mass. 2018) (finding that a breach of contract claim was properly pleaded and not moot because of the possibility of nominal damages as well as compensatory damages for the time value of money).

[11] Courts "may properly consider the relevant entirety of a document integral to or explicitly relied upon in the complaint, even though not attached to the complaint, without converting the motion into one for summary judgment."  Clorox Co. P. R. v. Proctor & Gamble Com. Co., 228 F.3d 24, 32 (1st Cir. 2000) (citation omitted).

intent of the parties" and "[t]he intent of the parties is determined by examining the plain language of the contract." Liptrap v. Coyne, 675 S.E.2d 693, 696 (N.C. Ct. App. 2009) (internal quotation marks and citation omitted). Any "ambiguities in contractual language must be resolved and the contract interpreted by the fact finder." Sirsi Corp. v. Craven-Pamlico-Carteret Reg'l Libr. Sys., 815 F. Supp. 2d 931, 934 (E.D.N.C. 2011) (citing Int'l Paper Co. v. Corporex Constructors, Inc., 385 S.E.2d 553, 556 (N.C. Ct. App. 1989)).

### 1. Basis for Freezing Accounts

Paragraph 2 of the Cardholder Agreement permits BANA to freeze an account "pending an investigation" of suspected "irregular, unauthorized or unlawful activities[.]" [Am. Compl. ¶¶ 139, 141]. Eggiman argues that this requires a "reasonable basis" for suspecting such activities. [Id.]. He then alleges that BANA had a "policy and practice" of freezing accounts in response to reports of unauthorized transactions, which he argues is insufficient to constitute a reasonable basis for freezing an account. [Id.]. The Court disagrees.

Eggiman's allegations constitute a reasonable basis for suspecting "irregular, unauthorized or unlawful activities."[12] See [ECF No. 13 at 4]. He alleges that BANA froze his account in response to his report that nearly all of his $10,000 in DUA funds had been stolen by an unauthorized actor, [Am. Compl. ¶¶ 72–73, 76], as well as his mother's subsequent report to the DUA that her son had been a victim of fraud, [id. ¶ 75]. These facts provide more than a sufficient basis for BANA to suspect unauthorized or illegal conduct. See Hardin v. Bank of Am., N.A., No. 22-cv-10023, 2022 WL 3568568, at *5 (E.D. Mich. Aug. 18, 2022) (finding

---

[12] BANA also disputes that the Cardholder Agreement requires a "reasonable basis" before suspending an account, see [ECF No. 16 at 6–7], but because Eggiman's facts do not satisfy his proposed reading of the contract, the Court need not reach the question of contractual interpretation.

suspicion of fraud gave BANA the right to freeze accounts based on the same contract terms, which provide that BANA may "freeze an account 'pending an investigation' if it 'suspect[s] irregular, unauthorized, or unlawful activities . . . involved with [the] Account'" (alterations in original) (citation omitted)).  Having himself reported such conduct, he cannot now claim that BANA lacked a basis for suspecting fraud.

2.    Length of Time Accounts Were Frozen

Eggiman next alleges that BANA "maintain[ed] freezes and blocks on accounts beyond the length of time necessary for a reasonable investigation."  [ECF No. 13 at 5 (internal quotations marks and citation omitted)].  In support of that proposition, he cites the fact that the freeze on his funds lasted over fifteen months, from December 2020 to March 2022, and argues that no reasonable investigation could take that long.  [Id. at 6].  BANA argues that the contract lacked any requirement that the investigation occur within a specific time period.  [ECF No. 16 at 7].  It emphasizes that the Cardholder Agreement only requires that the account be frozen "pending an investigation," and that Eggiman has not alleged any facts demonstrating BANA failed to conduct an investigation.  [Id. at 7–8].

Eggiman alleges that BANA initially stated that he could have his account unfrozen by visiting a BANA branch and verifying his identity with two forms of government ID, but that BANA subsequently informed Eggiman's mother that this process was "irrelevant" and that "the only way to unfreeze [Eggiman's] Account was through the Massachusetts DUA."  [Am. Compl. ¶¶ 78–79].  Indeed, BANA repeatedly represented that only the DUA could unfreeze Eggiman's account, see [Am. Compl. ¶¶ 76–77, 79, 83], and that, as a result,  BANA "would not be able to assist any further", [id. ¶ 84].  To the extent that BANA did conduct an investigation, Eggiman has plausibly alleged that BANA completed its identity verification process but still declined to

act independently of the DUA to unfreeze his account.  Moreover, BANA's repeated insistence that the DUA could unfreeze Eggiman's account does not support the suggestion that a BANA investigation was still pending.  Drawing all facts in the light most favorable to Eggiman, the Court finds he has sufficiently alleged that BANA did not keep his account frozen "pending an investigation."

### 3.    Availability of Eggiman's Funds

Eggiman's third theory of breach of contract concerns language in the Cardholder Agreement that requires BANA to make funds "available for your use on the day we have been instructed by the DUA to fund your Account."  [Am. Compl. ¶ 139]; accord [ECF No. 13 at 6]. In his reading of the contract, BANA must make funds available not just when DUA approves an application for unemployment assistance, but also when DUA has re-verified an individual's eligibility after a fraudulent transaction.  See [ECF No. 13 at 6].  BANA argues that this provision should be read to only apply to the original funding instruction from DUA, see [ECF No. 8 at 17], and that Eggiman's theory would prevent the bank from ever freezing the account, thereby rendering superfluous the sections permitting account freezes, see [ECF No. 16 at 8].

The plain language of the contract requires that BANA make funds available on the day that DUA instructs BANA to "fund [the] account."  [Am. Compl. ¶ 139].  Because Eggiman states that he received his card in August 2020 but did not attempt to activate it until December 2020, see [Am. Compl. ¶¶ 71–72], he cannot plausibly allege that BANA did not make the funds available to him in August 2020.  His alternative reading—that this provision requires BANA to unfreeze his account upon instructions from DUA—would call into question the contract's clear intent that BANA be able to freeze accounts pending its own investigations.  More significantly, his reading is foreclosed by the contractual language itself, which imposes the same-day

requirement only when DUA instructs BANA to "fund" the account.  Eggiman's extended discussions with DUA and BANA concerned only the unfreezing of his account, not the addition of new funds.  As a result, he has not alleged facts sufficient to support a breach of contract theory based on the same-day funding provision.

For the foregoing reasons BANA's motion to dismiss Count IV, as it relates to (i) BANA's alleged "policy and practice" of freezing cardholder accounts and (ii) alleged responsibility to make his DUA funds available to him in a timely manner, is <u>GRANTED</u>. BANA's motion to dismiss this claim as it relates to Eggiman's allegations that BANA maintained account freezes longer than contractually permitted is <u>DENIED</u>.

### C.    Count V (Breach of Implied Contract)

Under North Carolina law, an implied contract "arises where the intention of the parties is not expressed, but an agreement in fact, creating an obligation, is implied or presumed from their acts" or where the circumstances evince a "mutual intent to contract."  <u>Snyder v. Freeman</u>, 266 S.E.2d 593, 602 (N.C. 1980).  Like an express contract, the "essence" of an implied contract is "the mutual assent of both parties to the terms of the agreement so as to establish a meeting of the minds."  <u>Id.</u>  However, an important limitation on the doctrine of implied contract is that "an express contract precludes an implied contract with reference to the same matter[.]"  <u>Ron Medlin Constr. v. Harris</u>, 704 S.E.2d 486, 489 (N.C. 2010) (quoting <u>Vetco Concrete Co. v. Troy Lumber Co.</u>, 124 S.E.2d 905, 908 (N.C. 1962)).  That is because "[i]t is only when parties do not expressly agree that the law interposes and raises a promise[,]" because if an express agreement exists, it is assumed to "cover[] the whole subject matter" and "no promise is implied by law." <u>Snyder</u>, 266 S.E.2d at 603 (quoting <u>Vetco</u>, 124 S.E.2d at 908).  These principles squarely foreclose Eggiman's implied contract claim.  The parties clearly have a contractual agreement covering the commercial conduct at issue in this case.  While Eggiman may bring breach of

contract claims, he may not add extracontractual terms when an express agreement exists.

Moreover, even if an implied contract claim could proceed, he has pled no facts to demonstrate

that BANA assented to the specific customer service obligations and anti-fraud protections that

he alleges exist, including specific credit card anti-fraud technologies and investigatory

processes.  See [Am. Compl. ¶¶ 148–49].  The motion to dismiss Count V is thus GRANTED.[13]

### D.    Count VI (Breach of Implied Covenant of Good Faith and Fair Dealing)

"In every contract there is an implied covenant of good faith and fair dealing that neither

party will do anything which injures the right of the other to receive the benefits of the

agreement."  Heron Bay Acquisition, LLC v. United Metal Finishing, Inc., 781 S.E.2d 889, 894

(N.C. Ct. App. 2016) (quoting Bicycle Transit Auth., Inc. v. Bell, 333 S.E.2d 299, 305 (N.C.

1985)).  This covenant does not "interpose new obligations about which the contract is silent,"

but instead is "simply a recognition of conditions inherent in expressed promises."  Great Am.

Emu Co. v. E.J. McKernan Co., 509 F. Supp. 3d 528, 544 (E.D.N.C. 2020) (quoting E. Shore

Mkts., Inc. v. J.D. Assocs. Ltd. P'ship, 213 F.3d 175, 184 (4th Cir. 2000)).  To state a claim for

breach of this covenant, "a plaintiff must plead that the party charged has taken action which

injured the right of the plaintiff to receive the benefits of the agreement and deprived the plaintiff

of the fruits of his bargain."  Koch Measurement Devices, Inc. v. Armke, No. 12-cvs-3478, 2013

---

[13] Though the parties again do not directly address choice of law for this claim, the Court concludes that it need not reach this issue as Massachusetts law incorporates these same principles.  See, e.g., T.F. v. B.L., 813 N.E.2d 1244, 1249 (Mass. 2004) ("In the absence of an express agreement, an implied contract may be inferred . . . ."); Engler v. C.R. Bard, Inc., No. 94-cv-10602, 1997 WL 136249, at *6 (D. Mass. Mar. 6, 1997) (explaining that, under Massachusetts law as well as general common law doctrine, the "elements of an express and an implied contract are the same" (quoting Kirk v. United States, 451 F.2d 690, 695 (10th Cir. 1971))).

WL 5639221, at *6 (N.C. Super. Ct. Oct. 14, 2013) (citing <u>Bicycle Transit Auth., Inc.</u>, 333

S.E.2d 299).[14]

      Eggiman alleges that BANA breached this covenant by failing to: act in good faith to

safeguard his information and DUA benefits; appropriately operate its customer service function;

notify him of a potentially fraudulent transaction; properly investigate the fraud once reported;

and promptly lift the freeze on his account.  [<u>Id.</u> ¶¶ 155–57].  Particularly, Eggiman emphasizes

that BANA froze his account for over a year and provided no avenues for reimbursement.  <u>See</u>

[ECF No. 13 at 10].  BANA responds that this claim must be dismissed because it is duplicative

of his contract claim.  [ECF No. 8 at 18].  BANA also argues that Eggiman seeks to

impermissibly "rewrite" the terms of the contract.  [<u>Id.</u>].  In its view, Eggiman's examples of

"good faith" behavior are instead extracontractual provisions to which neither party agreed prior

to entering into the Cardholder Agreement.  [<u>Id.</u> at 18–19].

      The Fourth Circuit recently held that, under North Carolina law, a "[b]reach of the

implied covenant of good faith and fair dealing is a separate claim from breach of contract . . . ."

<u>Nadendla v. WakeMed</u>, 24 F.4th 299, 308 (4th Cir. 2022).  The covenant of good faith and fair

dealing "is not subsumed into [express breach]" so long as "the express terms of the contract do

not preclude the implied terms which the plaintiff claims were breached."  <u>Id.</u>  The Court finds

that some of Eggiman's proposed breaches of this implied covenant may impermissibly

---

[14] As with Count V, the parties do not indicate which jurisdiction's law should apply.  Again, the
Court need not reach the choice-of-law question here either, as Massachusetts and North
Carolina recognize the same legal principles.  <u>See, e.g.</u>, <u>Ayash v. Dana-Farber Cancer Inst.</u>, 822
N.E.2d 667, 683–84 (Mass. 2005) ("Every contract in Massachusetts is subject, to some extent,
to an implied covenant of good faith and fair dealing.  This implied covenant may not be
'invoked to create rights and duties not otherwise provided for in the existing contractual
relationship,' but rather concerns the manner of performance." (quoting <u>Uno Rests., Inc. v. Bos.
Kenmore Realty Corp.</u>, 805 N.E.2d 957, 964 (Mass. 2004)) (further internal citation omitted)).

contradict or expand the scope of the express terms of the contract.  For example, implying that BANA must "promptly issue BOA-DUA Debit Cards with EMV chips[,]" [Am. Compl. ¶ 157], as Eggiman suggests, is clearly an expansion of the express terms of the contract.  On the other hand, implying that BANA must "timely and adequately investigate and resolve claims of unauthorized transactions[,]" [id. ¶ 169], merely recognizes the "conditions inherent in [the] expressed promises[,]" Great Am. Emu Co., 509 F. Supp. 3d at 544, that BANA will investigate suspected fraud while also facilitating customers' access to their funds.  The Court therefore finds that Eggiman may bring this claim alongside his express contract claims.

The Court further finds that Eggiman has pleaded sufficient facts to establish that BANA breached the implied covenant of good faith and fair dealing.  Taking the facts in the light most favorable to Eggiman, he has alleged that the fifteen-month period during which BANA "made it impossible to get those accounts unfrozen" represented bad faith conduct.  [ECF No. 13 at 10].  BANA's allegedly deficient customer service, investigatory processes, and reimbursement procedures injured Eggiman's ability to enjoy "the fruits of his bargain[,]" Armke, 2013 WL 5639221, at *6 (citation omitted), that is, his access to banking services related to his DUA benefits.  See, e.g., Tasz, Inc. v. Indus. Thermo Polymers, Ltd., 80 F. Supp. 3d 671, 683 (W.D.N.C. 2015) (denying motion to dismiss breach of implied covenant of good faith and fair dealing claim where company did not "investigate and explain discrepancies in billing practices").  The motion to dismiss Count VI is therefore DENIED.

### E.     Count VII (Chapter 93A)

Chapter 93A provides that "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce" are unlawful.  Mass. Gen. Laws ch. 93A, § 2(a).  As the Massachusetts Supreme Judicial Court has explained, to determine whether

"conduct rises to the level of an 'unfair' act or practice actionable under [Chapter 93A]," courts consider "(1) whether the conduct is within 'at least the penumbra of some common-law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; [and] (3) whether it causes substantial injury to consumers' or other businesses . . . ." H1 Lincoln, Inc. v. S. Washington St., LLC, 179 N.E.3d 545, 557 (Mass. 2022) (quoting PMP Assocs. v. Globe Newspaper Co., 321 N.E.2d 915 (Mass. 1975)).  Further, "the defendant's conduct must generally be of an egregious, non-negligent nature." Walsh v. TelTech Sys., Inc., 821 F.3d 155, 160 (1st Cir. 2016) (citation omitted).  "Chapter 93A liability is decided case-by-case, and Massachusetts courts have consistently emphasized the 'fact-specific nature of the inquiry.'" Arthur D. Little, Inc. v. Dooyang Corp., 147 F.3d 47, 55 (1st Cir. 1998) (quoting Linkage Corp. v. Trs. of Bos. Univ., 679 N.E.2d 191, 209 (Mass. 1997)).  "Although whether a particular set of acts, in their factual setting, is unfair or deceptive is a question of fact, the boundaries of what may qualify for consideration as a [Chapter] 93A violation is a question of law." Arthur D. Little, 147 F.3d at 54 (alteration in original) (quoting Ahern v. Scholz, 85 F.3d 774, 797 (1st Cir. 1996)).

Eggiman alleges that BANA's has committed at least 15 "unfair" acts and business practices.  [Am. Compl. ¶ 164].  BANA responds that Eggiman has failed to adequately allege these acts are unfair within the meaning of Chapter 93A.  [ECF No. 8 at 23–26].  Additionally, BANA asserts that, whether or not these acts are "unfair," Eggiman has failed to allege more than conclusory statements that BANA engaged in this conduct.  [Id. at 25].  It further avers that, to the extent Eggiman's claim is based on a statutory violation of GLBA,[15] it must be dismissed

---

[15] BANA also argues that Eggiman has failed to allege a Chapter 93A claim based on an EFTA violation, see [ECF No. 8 at 27], but in addition to not opposing BANA's motion to dismiss his

because Eggiman has failed to allege a violation of the statute or that the underlying conduct violating the statute is "unfair."  [Id. at 27].  Eggiman claims that he has adequately alleged unfair or deceptive conduct because he has adequately alleged that BANA breached duties independent of contract and acted in bad faith.  [ECF No. 13 at 17].  Further, Eggiman argues he has adequately alleged a predicate GLBA violation, which is sufficient to support a Chapter 93A claim.  [Id.].

The Court finds that Eggiman's allegations that BANA breached the covenant of good faith and fair dealing, are, at this stage, also sufficient to plead a Chapter 93A claim.  See Martorana v. Progressive Direct Ins. Co., No. 22-cv-10613, 2023 WL 2465639, at *7 (D. Mass. Mar. 10, 2023) (declining to dismiss a Chapter 93A claim premised in part on conduct breaching the implied covenant of good faith and fair dealing, because such conduct "comes 'within any recognized or established common law . . . concept of fairness[,]' [it therefore] is actionable under Chapter 93A" (first alteration in original) (quoting VMark Software v. EMC Corp., 642 N.E.2d 587, 595 (Mass. App. Ct. 1994))); Anthony's Pier Four, Inc. v. HBC Assocs., 583 N.E.2d 806, 822 (Mass. 1991) (explaining that the judge's findings at trial related to defendant's "violation of the implied covenant of good faith and fair dealing . . . established as a matter of both fact and law that [defendant's] actions were unfair or deceptive" within the meaning of Chapter 93A).  On the other hand, the Court agrees that Eggiman cannot premise his Chapter 93A claim on a violation of the GLBA.  Eggiman has not alleged that conduct violating the GLBA, that is, "disclosing . . . non-public personal information" and failing to "take reasonable steps to protect the security and confidentiality" of that information, see [Am. Compl. ¶ 166], is

---

standalone EFTA violation, Eggiman appears to have abandoned this argument as well.  See [ECF No. 13 at 18].

independently "unfair or deceptive."  That is fatal to his claim.  See <u>Klairmont v. Gainsboro</u>

<u>Rest., Inc.</u>, 987 N.E.2d 1247, 1255 (Mass. 2013) ("[A] violation of a law or regulation . . . will be

a violation of [Chapter 93A], only if the conduct leading to the violation is both unfair or

deceptive and occurs in trade or commerce.").  BANA's motion to dismiss Count VII is

nevertheless <u>DENIED</u>.

## IV.      CONCLUSION

Defendant's motion to dismiss, [ECF No. 7], is therefore <u>GRANTED</u> as to Counts I, II,

III, and V, as well as Count IV, as to (i) BANA's alleged "policy and practice" of freezing

cardholder accounts and (ii) alleged responsibility to make his DUA funds available to him in a

timely manner; and <u>DENIED</u>, as to Counts VI and VII, and Count IV, as related to Eggiman's

allegations that BANA maintained account freezes longer than contractually permitted.

**SO ORDERED.**

March 27, 2023                                                    /s/ Allison D. Burroughs
                                                                 ALLISON D. BURROUGHS
                                                                 U.S. DISTRICT JUDGE